No. 25-10182

# In the United States Court of Appeals for the Fifth Circuit

STATE OF TEXAS,

*Plaintiff-Appellant,*

*v.*

PFIZER INC.,

*Defendant-Appellee.*

On Appeal from the United States District Court
for the Northern District of Texas, Lubbock Division

## BRIEF FOR DEFENDANT-APPELLEE

Carlton E. Wessel
DLA PIPER LLP (US)
500 Eighth St. NW
Washington, D.C. 20004

Andrew J. Hoffman II
DLA PIPER LLP (US)
Suite 400, 2000 Ave. of the Stars
Los Angeles, CA 90067

Meagan D. Self
DLA PIPER LLP (US)
Suite 2200, 1900 N. Pearl St.
Dallas, TX 75201

Scott A. Keller
   *Counsel of Record*
LEHOTSKY KELLER COHN LLP
408 W. 11th St., 5th Floor
Austin, TX 78701
(512) 693-8350
scott@lkcfirm.com

Mark M. Rothrock
LEHOTSKY KELLER COHN LLP
8513 Caldbeck Dr.
Raleigh, NC 27615

Additional counsel listed on inside cover.

Lianna Bash
DLA Piper LLP (US)
Suite 6900, 701 Fifth Ave.
Seattle, WA 98104

*Counsel for Defendant-Appellee*

# Certificate of Interested Persons

No. 25-10182

State of Texas,

*Plaintiff-Appellant,*

*v.*

Pfizer Inc.,

*Defendant-Appellee.*

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification of recusal.

**Defendant-Appellee:**

Pfizer Inc., is a publicly held corporation that has no parent corporation. No publicly held corporation owns 10% or more of the stock of Pfizer Inc.

**Counsel for Defendant-Appellee:**

Scott A. Keller (lead counsel)  
Lehotsky Keller Cohn LLP  
408 W. 11th St., 5th Floor  
Austin, TX 78701  
T: (512) 693-8350  
F: (512) 727-4755  

Carlton E. Wessell  
DLA Piper LLP (US)  
500 Eighth St. NW  
Washington, D.C. 20004

Mark M. Rothrock
Lehotsky Keller Cohn LLP
8513 Caldbeck Dr.
Raleigh, NC 27615

Andrew J. Hoffman II
DLA Piper LLP (US)
Suite 400, 2000 Ave. of the Stars
Los Angeles, CA 90067

Meagan D. Self
DLA Piper LLP (US)
Suite 2200, 1900 N. Pearl St.
Dallas, TX 75201

Lianna Bash
DLA Piper LLP (US)
Suite 6900, 701 Fifth Ave.
Seattle, WA 98104

**Plaintiff-Appellant:**
State of Texas

**Counsel for Plaintiff-Appellant:**
Ken Paxton
Brent Webster
Ralph Molina
Austin Kinghorn
Office of the Texas Attorney
General
300 W. 15th St., 9th Floor
Austin, TX 78711

Jonathan Stone
Abigail E. Smith
Office of the Texas Attorney
General
Consumer Protection Division
12221 Merit Dr., Suite 650
Dallas, TX 75251
T: (214) 290-8830

*/s/ Scott A. Keller*
Scott A. Keller

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument is unnecessary to affirm this appeal in Pfizer's favor. The State of Texas alleges Texas Deceptive Trade Practices Act claims that the district court correctly dismissed on four different, independent grounds, any one of which is sufficient to affirm. If this Court believes oral argument is necessary, Defendant requests the opportunity to participate to assist the Court in resolving the appeal.

# TABLE OF CONTENTS

Page

Certificate of Interested Persons..........................................................................i

Statement Regarding Oral Argument ...............................................................iii

Table of Authorities.......................................................................................vii

Introduction.....................................................................................................1

Statement of Jurisdiction ..................................................................................5

Issues Presented................................................................................................5

Statement of the Case.......................................................................................6

    A.    Pfizer developed a COVID-19 vaccine, which the federal government bought and distributed to citizens in massive quantities, at the height of the COVID-19 pandemic emergency..........................................................................7

        1.    The federal government declared a public health emergency under the federal Public Readiness and Emergency Preparedness (PREP) Act to encourage private companies to help stop the COVID-19 pandemic....................................................................7

        2.    Pfizer worked expeditiously to develop a COVID-19 vaccine and contracted with the federal government as part of Operation Warp Speed to provide 100 million doses. .........................................................9

        3.    Pfizer conducted the Landmark Study, demonstrating the COVID-19 vaccine's efficacy. .............11

        4.    The Food and Drug Administration (FDA) granted Pfizer's COVID-19 vaccine an "Emergency Use Authorization," and Pfizer delivered millions of doses of its vaccine to the federal government. ................12

        5.    Pfizer made public statements about its COVID-19 vaccine and completed the clinical trial, leading to full FDA approval...............................................................15

    B.    Procedural history. ........................................................................17

Summary of the Argument ............................................................18

Standard of Review ......................................................................23

Argument......................................................................................23

I. The federal Public Readiness and Emergency Preparedness (PREP) Act both grants Pfizer immunity against the State's claims and preempts them........................................................23

    A. The PREP Act immunizes Pfizer from the State's claims, because they are "claims for loss . . . relating to . . . the administration" of Pfizer's vaccine to individuals. ...................24

        1. The State asserts "claims for loss" because it alleges harms to state citizens and seeks damages and restitution to remedy those harms. .....................................25

        2. The State's claims "relat[e] to . . . the administration" of the Pfizer vaccine because they are premised on millions of individuals receiving the Pfizer vaccine in Texas. ..................................................29

        3. The State's reading of the PREP Act is the reading that creates absurdities. ........................................................31

    B. The PREP Act preempts the State's claims because they enforce state laws that are "different from" the "requirements" in *this section*—that is, 42 U.S.C. § 247d-6d. ..................................................................................................33

        1. The Texas Deceptive Trade Practices Act imposes "requirement[s]" that are "different from," or "in conflict with," the "requirement[s] applicable under *this section*"—42 U.S.C. § 247d-6d.......................................34

        2. The State ignores the PREP Act's unambiguous statutory text. ..........................................................................39

II. The federal Food, Drug, and Cosmetic Act (FDCA) also preempts the State's claims........................................................42

III. The State failed to state claims under the Texas Deceptive Trade Practices Act (DTPA). ..............................................................46

    A. The State failed to allege misrepresentations in connection with a "consumer transaction" involving Pfizer, because

state citizens obtained Pfizer's vaccine from the federal
government for free. ..........................................................46

B.    The alleged misrepresentations are not connected to
"trade" or "commerce." .................................................49

Conclusion..........................................................................................54

Certificate of Service ........................................................................55

Certificate of Compliance.................................................................55

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel. Barez,*
    458 U.S. 592 (1982) ...............................................................27, 28

*Amstadt v. U.S. Brass Corp.,*
    919 S.W.2d 644 (Tex. 1996) .......................................5, 22, 46, 48, 49

*Atria Grp., Inc. v. Good,*
    555 U.S. 70 (2008) ...........................................................................42

*Bartenwerfer v. Buckley,*
    598 U.S. 69 (2023) ...........................................................................33

*Bates v. Dow Agrosciences LLC,*
    544 U.S. 431 (2005) ....................................................................35, 40

*Brittan Commc'ns Int'l Corp. v. Sw. Bell Telephone Co.,*
    313 F.3d 899 (5th Cir. 2002) ...........................................................46

*Brown v. Bank of Galveston, Nat'l Ass'n,*
    963 S.W.2d 511 (Tex. 1998) ............................................................37

*Buckman Co. v. Plaintiffs' Legal Comm.,*
    531 U.S. 341 (2001) ....................................................................42, 44

*Camacho v. Ford Motor Co.,*
    993 F.3d 308 (5th Cir. 2021) ...........................................................50

*Cowen v. Walgreen Co.,*
    2022 WL 17640208 (N.D. Okla. Dec. 13, 2022) .............................32

*Cruz v. Andrews Restoration, Inc.,*
    364 S.W.3d 817 (Tex. 2012) ............................................................28

*Doe v. Boys Clubs of Greater Dallas, Inc.,*
   907 S.W.2d 472 (Tex. 1995) ............................................................ 32

*Flenniken v. Longview Bank & Trust Co.,*
   661 S.W.2d 705 (Tex. 1983) ............................................................ 49

*Ford Motor Co. v. Parks,*
   691 S.W.3d 475 (Tex. 2024) ............................................................ 51

*Fort Worth Transp. Auth. v. Rodriguez,*
   547 S.W.3d 830 (Tex. 2018) ............................................................ 50

*Gibson v. Johnson & Johnson,*
   2023 WL 4851413 (E.D. Pa. July 28, 2023) ................................... 32

*Greater Hou. P'Ship v. Paxton,*
   468 S.W.3d 51 (Tex. 2015) .............................................................. 51

*Hampton v. California,*
   83 F.4th 754 (9th Cir. 2023) ............................................................ 23

*Harrison v. Jefferson Par. Sch. Bd.,*
   78 F.4th 765 (5th Cir. 2023) ............................................................ 28

*Hillsborough Cnty. v. Automated Med. Lab'ys., Inc.,*
   471 U.S. 707 (1985) ................................................................... 42, 45

*Hogan v. Zoanni,*
   627 S.W.3d 163 (Tex. 2021) ............................................................ 47

*Household Retail Servs., Inc. v. State,*
   2001 WL 984779 (Tex. App.–San Antonio Aug. 29, 2001, no
   pet.) ................................................................................................... 49

*Jacob v. Mentor Worldwide, LLC,*
   40 F.4th 1329 (11th Cir. 2022) ........................................................ 40

*La. State by & through La. Dep't of Wildlife & Fisheries v. Nat'l Oceanic & Atmospheric Admin.*,
70 F.4th 872 (5th Cir. 2023) ................................................................3, 19, 27

*Latiolais v. Huntington Ingalls, Inc.*,
951 F.3d 286 (5th Cir. 2020) (en banc) ...........................................29

*Lexon Ins. Co., Inc. v. Fed. Deposit Ins. Corp.*,
7 F.4th 315 (5th Cir. 2021) ................................................................25

*Maney v. Brown*,
91 F.4th 1296 (9th Cir. 2024) ...............................................24, 25

*Martin v. Lou Poliquin Enterprises, Inc.*,
696 S.W.2d 180 (Tex. App.—Houston [14th Dist.] 1985, writ ref'd n.r.e.) ................................................................53

*Medtronic, Inc. v. Lohr*,
518 U.S. 470 (1996) ................................................................40, 41

*Miller v. Keyser*,
90 S.W.3d 712 (Tex. 2002) ................................................................37

*Montalvo v. Bank of Am. Corp.*,
864 F. Supp. 2d 567 (W.D. Tex. 2012)................................................47

*Mother & Unborn Baby Care of N. Tex., Inc. v. State*,
749 S.W.2d 533 (Tex. App.—Ft. Worth 1988, writ denied)..................52, 53

*In re Nalle Plastics Family Ltd. P'ship*,
406 S.W.3d 168 (Tex. 2013) ................................................................28

*Nw., Inc. v. Ginsburg*,
572 U.S. 273 (2014) ................................................................29

*Paxton v. Dettelbach*,
105 F.4th 708 (5th Cir. 2024) ...............................................27, 28

*Pie Dev., LLC v. Pie Carrier Holdings, Inc.,*
128 F.4th 657 (5th Cir. 2025) ...................................................6, 23

*Rayford v. Maselli,*
73 S.W.3d 410 (Tex. App. –Houston [1st Dist.] 2002, no pet.).........5, 22, 47

*Riverside Nat'l Bank v. Lewis,*
603 S.W.2d 169 (Tex. 1980) ............................................49

*Samantar v. Yousuf,*
560 U.S. 305 (2010) .............................................................25

*Swindol v. Aurora Flight Scis. Corp.,*
805 F.3d 516 (5th Cir. 2015) ...............................................9

*Todd v. Perry Homes,*
156 S.W.3d 919 (Tex. App.–Dallas 2005, no pet.) .......................................46

*Word of Faith Outreach Ctr. Church, Inc. v. Morales,*
787 F. Supp. 689 (W.D. Tex. 1992) ..................................47

*Wyeth v. Levine,*
555 U.S. 555 (2009) ..................................................45

*Young Conservatives of Tex. Found. v. Smatresk,*
73 F.4th 304 (5th Cir. 2023) ..........................................41

*Zyla Life Scis., L.L.C. v. Wells Pharma of Hou., L.L.C.,*
134 F.4th 326 (5th Cir. 2025) .....................................5, 21, 42, 44, 45

## Statutes

7 U.S.C. § 136v ........................................................................40

21 U.S.C. § 360bbb-3 ...........................................6, 13, 21, 42, 43, 44

21 U.S.C. § 360bbb-39 ...........................................................45

21 U.S.C. § 360k ..................................................................40

28 U.S.C. § 1291 ....................................................................5

28 U.S.C. § 1331 ....................................................................5

28 U.S.C. § 1441 ....................................................................5

28 U.S.C. § 1442 ....................................................................5

42 U.S.C. § 247d-6d...................................3, 4, 6, 8, 19, 20, 21, 24, 25, 26, 28, 29,

30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 41

Covid-19 Consumer Protection Act, Pub. L. No. 116-260, § 1401,
134 Stat. 1182, 3275 (2020) ...................................................4, 31, 39

Tex. Bus. & Com. Code § 17.41....................................................36, 38

Tex. Bus. & Com. Code § 17.44.....................................................6, 48

Tex. Bus. & Com. Code § 17.45.....................................................23, 47

Tex. Bus. & Com. Code § 17.46................................................5, 23, 49, 50

Tex. Bus. & Com. Code § 17.47...................................................29, 38, 48

Tex. Bus. & Com. Code § 17.50.......................................................28

**Other Authorities**

85 Fed. Reg. 15,198 (Mar. 17, 2020).................................................9

89 Fed. Reg. 99,875 (Dec. 11, 2024) .................................................9

*Administer*, Black's Law Dictionary (12th ed. 2024)..................................30

*Advertising*, Black's Law Dictionary (12th ed. 2024)..................................50

Ben Guarino et al., *'The Weapon That Will End the War': First
Coronavirus Vaccine Shots Given Outside of Trials in U.S.*,
Wash. Post (Dec. 14, 2020), https://perma.cc/TYK7-UW7X .....................15

Center for Disease Control, Covid Data Tracker,
https://perma.cc/H2HD (last accessed May 22, 2025) GKM7 ....................1

Claudio Marabotti, *Efficacy and effectiveness of covid-19 vaccine –
absolute vs. relative risk reduction*, Nat'l Inst. of Health, Nat'l
Lib. of Med. (Apr. 14, 2022), https://perma.cc/Y53R-WYE8 ......................12

*Commerce*, Black's Law Dictionary (12th ed. 2024) ....................................51, 52

Ctrs. for Medicare & Medicaid Servs., *Trump Admin. Acts to
Ensure Coverage of Life-Saving COVID-19 Vaccines &
Therapeutics* (Nov. 13, 2020), https://perma.cc/37LR-2WMU ....................15

*Distribution*, Black's Law Dictionary (12th ed. 2024) ......................................51

George W. Bush, *President Outlines Pandemic Influenza
Preparations & Response* (Nov. 1, 2005),
https://perma.cc/PT65-FYEK ..........................................................................2

Health & Human Servs., Food & Drug Admin., *Emergency Use
Authorization for Vaccines Explained* (Nov. 20, 2020),
https://perma.cc/9YHT-Y2AA ........................................................................13

*Lease*, Black's Law Dictionary (12th ed. 2024).............................................51, 52

*Loss*, Black's Law Dictionary (12th ed. 2024) ..............................................25, 26

Michelle L. Holshue, et al., *First Case of 2019 Novel Coronavirus
in the United States*, 382 N. Engl. J. Med. 929 (2020).....................................7

Pfizer, *Pfizer and BioNTech Confirm High Efficacy and No Serious
Safety Concerns Through Up to Six Months Following Second
Dose in Updated Topline Analysis of Landmark COVID-19
Vaccine Study* (Apr. 1, 2021), https://perma.cc/Q9XJ-5KA8 .......................16

Preemption of State and Local Requirements Under a PREP Act
Declaration, 2021 WL298368 (O.L.C. Jan. 19, 2021) ..................24, 35, 36, 38

*Requirement*, Black's Law Dictionary (12th ed. 2024)......................................35

*Sale*, Black's Law Dictionary (12th ed. 2024)...............................................50, 52

Sharon LaFraniere and Zach Montague, *Pfizer Seals Deal With U.S. For 100 Million More Vaccine Doses*, N.Y. TIMES (Dec. 23, 2020), https://perma.cc/9J3A-SJHA ...............................................................11

Tex. Dep't of State Health Servs., *Reducing Vaccine-Preventable Disease in Texas: Strategies to Increase Vaccine Coverage Levels* (Dec. 2022), https://perma.cc/84MB-DDC6..................................................17

The Commonwealth Fund, *Two Years of U.S. COVID-19 Vaccines Have Prevented Millions of Hospitalizations and Deaths* (Dec. 13, 2022), https://perma.cc/EL33-G53P ...................................................................2

*Trade*, Black's Law Dictionary (12th ed. 2024)...........................................51, 52

U.S. Dep't of Def., *Immediate Release: Trump Admin. Announces Framework and Leadership for 'Operation Warp Speed'* (May 15, 2020), https://perma.cc/S4X8-TDGC ...........................................................10

U.S. Food & Drug Admin., *Coronavirus (COVID-19) Update: FDA Takes Action to Help Facilitate Timely Development of Safe, Effective COVID-19 Vaccines* (June 30, 2020), https://perma.cc/VM7A-C9NY ......................................................................13

U.S. Food & Drug Admin., *FDA Approves First COVID-19 Vaccine* (Aug. 23, 2021), https://perma.cc/L2KR-LW6K ...........................16

U.S. Food & Drug Admin., *FDA Takes Action in Fight Against COVID-19 By Issuing Emergency Use Authorization for First COVID-19 Vaccine* (Dec. 11, 2020), https://perma.cc/ZQ2K-RYTJ.........................................................................................................14, 15

U.S. Food & Drug Admin, *Joint Statement from HHS Public Health and Medical Experts on COVID-19 Booster Shots* (Aug. 18, 2021), https://perma.cc/E7S3-UBPC .......................................................16

## INTRODUCTION

The COVID-19 pandemic tragically took the lives of over 1.2 million Americans.[1] Yet this staggering toll would have been catastrophically higher without a historical scientific achievement. Faced with the deadliest pandemic in a century and the shutdown of the global economy, the United States used numerous tools to encourage the development of a vaccine to save lives. What followed was nothing short of a modern medical miracle: one of the fastest vaccine developments in history, with an efficacy rate exceeding expectations, delivered at unprecedented scale across the world.

Federal law immunizes and preempts state-law claims that would punish the very companies, like Pfizer, whose Herculean efforts created these emergency COVID-19 vaccines. Pfizer rapidly developed a safe and effective COVID-19 vaccine—compressing what typically takes years into months, risking billions of dollars, and mobilizing thousands of scientists working around the clock while the pandemic raged. Recognizing that every day of delay meant more deaths, the federal government partnered with companies like Pfizer through Operation Warp Speed to bring life-saving vaccines to the American people as quickly and safely as possible. Pfizer's vaccine, together with vaccines developed by other companies, "prevented more than

---

[1] Center for Disease Control, Covid Data Tracker, https://perma.cc/H2HD-GKM7 (last accessed May 22, 2025).

1

18.5 million additional hospitalizations and 3.2 million additional deaths" between December 2020 and November 2022.[2]

Now, safely removed from the darkest days of the pandemic, the State of Texas seeks to punish the very company that helped end the crisis. With the luxury of hindsight, the State brought this suit alleging that Pfizer violated Texas's Deceptive Trade Practices Act ("DTPA") by publicly discussing its COVID-19 vaccine.

Congress saw this type of lawsuit coming. Congress understood that in the aftermath of a public health crisis, there would be those who—from the safety of the crisis having passed—would second-guess and attack the companies and people who worked tirelessly to save lives. Congress also recognized the devastating consequences of this dynamic: Vaccine developers would hesitate to act in a public emergency. Congress accordingly passed the Public Readiness and Emergency Preparedness Act (the "PREP Act") "to remove one of the greatest obstacles to domestic vaccine production: the growing burden of litigation." George W. Bush, *President Outlines Pandemic Influenza Preparations & Response* (Nov. 1, 2005), https://perma.cc/PT65-FYEK (hereinafter "President Bush Statement").

---

[2] The Commonwealth Fund, *Two Years of U.S. COVID-19 Vaccines Have Prevented Millions of Hospitalizations and Deaths* (Dec. 13, 2022), https://perma.cc/EL33-G53P.

The PREP Act immunizes any "claims for loss" "relating to" the "administration" of Pfizer's COVID-19 vaccine. 42 U.S.C. § 247d-6d(a)(1). That includes the State's claims here that its citizens were somehow deprived of the ability to make informed vaccination decisions, since that deprivation is plainly a "loss" to those individuals related to the administration of the vaccine. The State tries to avoid this straightforward conclusion by suing *parens patriae*, claiming that it is enforcing consumer protection laws and not any specific loss. But *parens patriae* requires a State to seek "to vindicate an injury to a sufficiently substantial segment of its population." *La. State by & through La. Dep't of Wildlife & Fisheries v. Nat'l Oceanic & Atmospheric Admin.*, 70 F.4th 872, 881 (5th Cir. 2023) (citation omitted). A claim for injury squarely falls under the definition of "loss" under the PREP Act and is exactly the type of claim barred by PREP Act immunity. The State's invocation of *parens patriae* thus gets it nowhere.

The PREP Act also preempts the State's claims. The PREP Act broadly preempts state-law requirements "*different from*, or . . . in conflict with, any requirement applicable under *this section*"—that is, under 42 U.S.C. § 247d-6d. *Id.* § 247d-6d(b)(8)(A) (emphases added). The State's brief conspicuously never asserts that any provision of § 247d-6d imposes a requirement that is the *same* as a Texas DTPA provision. That is because the requirements are very different. Instead, the State jarringly relies on *other* federal statutes: It argues that its claims "mirror available federal" requirements under the "Covid-19 Consumer Protection Act" and "section 5(a) of the FTC Act."

Br.20-21. That argument, however, ignores the PREP Act's plain text stating that requirements outside of § 247d-6d cannot defeat preemption. The State's claims are therefore expressly preempted, especially since the State does not even bother to dispute the second element for preemption: That its claims challenging Pfizer's statements about the efficacy of the vaccine "*relate[] to the . . . clinical testing or investigation, . . . marketing,* [or] *promotion*" of Pfizer's vaccine. 42 U.S.C. § 247d-6d(b)(8)(B) (emphases added).

This does not mean vaccine manufacturers like Pfizer can say anything about their products, as the State suggests. Br.31. The *federal* government, including federal agencies like the Federal Trade Commission, can still enforce federal laws. The PREP Act does not "abrogate or limit" the federal government's enforcement authority. 42 U.S.C. § 247d-6d(f); *see* Covid-19 Consumer Protection Act, Pub. L. No. 116-260, § 1401, 134 Stat. 1182, 3275 (2020) (cited at Br.7) (authorizing FTC to file suit for deceptive practices associated with COVID-19). But it does eliminate *States*' enforcement authority when state law differs from the PREP Act's requirements. 42 U.S.C. § 247d-6d(b)(8).

Even beyond the PREP Act, the Food, Drug, and Cosmetic Act ("FDCA") preempts the State's claims. The State is collaterally attacking the FDA's decision to grant Pfizer an emergency use authorization for its COVID-19 vaccine by attacking the efficacy of the vaccine and the FDA's decision to rely on relative risk reduction. That questioning of the FDA's expert decision improperly seeks to "judge[] insufficient" through a state cause of action an

"action deemed appropriate by" the agency. *Zyla Life Scis., L.L.C. v. Wells Pharma of Hou., L.L.C.*, 134 F.4th 326, 338 (5th Cir. 2025).

In all events, the State's claims fail as a matter of state law. The DTPA protects consumers with respect to "consumer transactions," *Amstadt v. U.S. Brass Corp.*, 919 S.W.2d 644, 649 (Tex. 1996), involving "trade" and "commerce," Tex. Bus. & Com. Code § 17.46(a). But state citizens received the Pfizer vaccine from the federal government *for free,* so the DTPA simply does not cover this situation. *See Rayford v. Maselli*, 73 S.W.3d 410, 411 (Tex. App. –Houston [1st Dist.] 2002, no pet.).

In sum, the district court correctly held that the PREP Act immunizes against and preempts these claims, the FDCA also preempts them, and Texas has not stated DTPA claims in any event. Each is an independent basis for dismissal, and this Court should affirm.

## STATEMENT OF JURISDICTION

The Court has jurisdiction under 28 U.S.C. § 1291 because the State has appealed the district court's final judgment. ROA.842-43. The district court properly exercised jurisdiction under 28 U.S.C. §§ 1331, 1441, and 1442(a)(1), and issued a final judgment on December 20, 2024. ROA.844. The State timely appealed that judgment on January 8, 2025. ROA.845.

## ISSUES PRESENTED

1.  Whether the district court correctly held that the PREP Act immunizes Pfizer from the State's claims, as they are "claims for loss . . .

relating to . . . the administration" of Pfizer's COVID-19 vaccine to individuals. 42 U.S.C. § 247d-6d(a)(1).

2.  Whether the district court correctly held that the PREP Act preempts the State's claims, as they "relate[] to" the "*clinical testing or investigation, . . . marketing,* [or] *promotion*" of Pfizer's vaccine, and seek to "enforce" state-law requirements "*different from,* or in conflict with, any requirement applicable under *this section*"—that is, 42 U.S.C. § 247d-6d of the PREP Act. *Id.* § 247d-6d(b)(8) (emphases added).

3.  Whether the district court correctly held that the FDCA preempts the State's claims, as they essentially attack the federal Food and Drug Administration's exclusive power to authorize a vaccine for "emergency use." 21 U.S.C. § 360bbb-3.

4.  Whether the district court correctly held that Texas failed to state claims under the Texas DTPA, as the claims here are neither "in connection with" a "consumer transaction" nor "trade" or "commerce." Tex. Bus. & Com. Code §§ 17.44-.46.

## STATEMENT OF THE CASE

The State's complaint and its opening brief to this Court repeatedly make inaccurate allegations about Pfizer's vaccine. Regardless, even accepting all the State's well-pleaded factual allegations as true at this motion-to-dismiss stage, *see Pie Dev., LLC v. Pie Carrier Holdings, Inc.*, 128 F.4th 657, 661 (5th Cir.

2025) (stating Rule 12(b)(6) standard), the district court correctly dismissed the State's complaint.

## A. Pfizer developed a COVID-19 vaccine, which the federal government bought and distributed to citizens in massive quantities, at the height of the COVID-19 pandemic emergency.

Facing the largest public health crisis in a century, Pfizer quickly developed a COVID-19 vaccine that saved millions of lives and helped return Americans to normalcy. As soon as the pandemic began, both Pfizer and the federal government took action. The federal government invoked the PREP Act to provide companies working to stop the pandemic, like Pfizer, with protection from lawsuits. And it created Operation Warp Speed to facilitate the development of a vaccine. In response, Pfizer developed a safe and effective vaccine, obtained an "emergency use authorization" from the FDA, and provided hundreds of millions of doses to the federal government. All the while, both the federal government and Pfizer shared information about the vaccine—which the government provided for free—with the American public.

### 1. The federal government declared a public health emergency under the federal Public Readiness and Emergency Preparedness (PREP) Act to encourage private companies to help stop the COVID-19 pandemic.

The novel coronavirus known as SARS-CoV-2, which causes the disease COVID-19, was first reported in the United States in January 2020. *See* Michelle L. Holshue, et al., *First Case of 2019 Novel Coronavirus in the United*

*States*, 382 N. Engl. J. Med. 929, 929 (2020). Shortly thereafter, the U.S. Secretary of Health and Human Services ("HHS") declared a public-health emergency related to COVID-19 under section 319 of the Public Health Service Act. ROA.52 ¶35. Despite mitigation efforts, the virus continued to spread. So on March 13, 2020, President Trump declared COVID-19 a "national emergency." ROA.52 ¶35. Thereafter, the federal government took many emergency actions to stop the pandemic and save lives.

For one, it invoked the PREP Act. Passed in 2005, the PREP Act makes it easier for emergency medical treatments to reach the public during a public health emergency. The Act provides a "covered person" with expansive immunity from lawsuits relating to a "covered countermeasure" whenever the HHS Secretary issues a declaration "that a disease . . . constitutes a public health emergency" and identifies the specific countermeasures and persons with immunity. 42 U.S.C. § 247d-6d(a), (b)(1). Additionally, the Act preempts any state laws that impose any requirements that are "different" from the PREP Act's requirements. *Id.* § 247d-6d(b)(8). The Act protects a broad array of countermeasures beyond just vaccines, but its core purpose was to protect vaccine manufacturers from "the growing burden of

litigation." President Bush Statement ("Congress must pass liability protection for the makers of life-saving vaccines.").[3]

Accordingly, on March 17, 2020—just four days after the President declared COVID-19 a national emergency—the HHS Secretary issued a declaration under the PREP Act. *See* 85 Fed. Reg. 15,198, 15,201 (Mar. 17, 2020). That declaration announced the "COVID-19 outbreak" as a "public health emergency," requiring a "sustained, coordinated proactive response by the [g]overnment in order to contain and mitigate the spread" of the virus. *Id*. It further provided that "any vaccine[] used to . . . prevent[] or mitigate COVID-19" qualifies as a "covered countermeasure," and that any "manufacturer" of the vaccine is a "covered person," under the PREP Act. *Id.* at 15,201-02. The Secretary renewed and amended this declaration numerous times, and its core provisions remain in effect. *See* 89 Fed. Reg. 99,875 (Dec. 11, 2024).

### 2. Pfizer worked expeditiously to develop a COVID-19 vaccine and contracted with the federal government as part of Operation Warp Speed to provide 100 million doses.

As the pandemic continued, more and more Americans contracted COVID-19. So the Trump Administration launched another initiative to get

---

[3] Courts routinely take judicial notice of government websites and other public pronouncements from federal agencies. *See Swindol v. Aurora Flight Scis. Corp.*, 805 F.3d 516, 519 (5th Cir. 2015).

a vaccine to the American people as quickly and safely as possible: Operation Warp Speed.

Operation Warp Speed was "a public-private partnership to facilitate, at an unprecedented pace, the development, manufacturing, and distribution of COVID-19 countermeasures." U.S. Dep't of Def., *Immediate Release: Trump Admin. Announces Framework and Leadership for 'Operation Warp Speed'* (May 15, 2020), https://perma.cc/S4X8-TDGC. The Operation had a staggeringly ambitious goal: "to have substantial quantities of a safe and effective vaccine available for Americans by January 2021." *Id.*

When Operation Warp Speed began, Pfizer was in the early phases of developing a COVID-19 vaccine, and the prospects of having a vaccine to meet Operation Warp Speed's ambitious deadline were far from certain. *See* ROA.53 ¶39. But Pfizer pushed forward both with research and a plan to get massive quantities of its vaccine to the federal government. Under Operation Warp Speed, Pfizer contracted in July 2020 to sell its vaccine to the U.S. Department of Defense. ROA.52 ¶37. The relevant contracts required Pfizer to provide a safe and effective COVID-19 vaccine to the federal government, with the Department of Defense paying Pfizer $19.50 per dose for 100 million doses if and when the FDA authorized the vaccine for emergency use. ROA.57-58 ¶¶53-54.

Providing the public with a safe and effective COVID-19 vaccine was of such importance to the government that on December 22, 2020, the government invoked the Defense Production Act and modified its contract with

Pfizer to incorporate a "priority rating" that allowed Pfizer priority access to key vaccine components.[4] This priority rating helped ensure Pfizer could produce and deliver the required quantities of COVID-19 vaccine on Operation Warp Speed's accelerated schedule.

### 3. Pfizer conducted the Landmark Study, demonstrating the COVID-19 vaccine's efficacy.

Soon after finalizing the government-purchase agreement with the Department of Defense, Pfizer launched a large-scale clinical trial to evaluate the safety and efficacy of its COVID-19 vaccine. ROA.53 ¶¶39-40. This clinical trial, known as the "Landmark Study," enrolled nearly 40,000 participants. ROA.54 ¶43. Under the clinical trial protocol, about half of the participants received Pfizer's vaccine candidate, with the remaining participants receiving placebo injections. ROA.54-55 ¶¶43-44.

In late 2020, Pfizer announced the Landmark Study's efficacy results regarding both *relative* and *absolute* risk reduction from the vaccine. The "relative risk reduction between the placebo group and the treatment group was 95%." ROA.54-55 ¶44. Crucially, Texas's brief never disputes the accuracy of this representation about the vaccine's relative risk reduction. Additionally, the "absolute reduction" was roughly 1 percent. ROA.55 ¶45.

---

[4] *See* Sharon LaFraniere and Zach Montague, *Pfizer Seals Deal With U.S. For 100 Million More Vaccine Doses,* N.Y. Times (Dec. 23, 2020), https://perma.cc/9J3A-SJHA.

The contrast in these relative versus absolute risk reduction figures was not because Pfizer's COVID-19 vaccine was ineffective, but because so few placebo participants contracted COVID-19. ROA.55 ¶45. Just as in other contexts, *absolute* risk reduction accounts for both (1) the *efficacy* of a medical intervention and (2) the *prevalence* of the disease it treats. Claudio Marabotti, *Efficacy and effectiveness of covid-19 vaccine – absolute vs. relative risk reduction*, Nat'l Inst. of Health, Nat'l Lib. of Med. (Apr. 14, 2022), https://perma.cc/Y53R-WYE8. By contrast, *relative* risk reduction focuses on only the former—that is, the *efficacy* of the intervention, regardless of disease prevalence. *Id*. *Absolute* risk reduction is a useful metric for determining the efficacy of treatments for diseases *whose prevalence is stable*—like coronary heart disease. *Id*. But *relative* risk reduction can be a more useful metric for diseases *whose prevalence changes dramatically over time*—like influenza or another fast-spreading virus. *Id*. Relative risk thus describes how well a vaccine protects people at any given moment when (as in a pandemic) the prevalence of the virus is changing.

### 4. The Food and Drug Administration (FDA) granted Pfizer's COVID-19 vaccine an "Emergency Use Authorization," and Pfizer delivered millions of doses of its vaccine to the federal government.

Based on the Landmark Study's results, Pfizer requested that the FDA authorize its COVID-19 vaccine for emergency use. An "emergency use authorization" under the FDCA allows vaccines and other countermeasures to be used in a public health emergency—even though they have not received

the FDA's approval for commercial distribution under the ordinary approval process. 21 U.S.C. § 360bbb-3; *see* U.S. Dep't of Health & Human Servs., Food & Drug Admin., *Emergency Use Authorization for Vaccines Explained* (Nov. 20, 2020), https://perma.cc/PT65-FYEK.

For a vaccine to receive an emergency use authorization, the FDA must determine that three statutory criteria are satisfied based on the "totality of scientific evidence," "including data from adequate and well-controlled clinical trials, if available." 21 U.S.C. § 360bbb-3(c)(2). Specifically, the FDA must find that (1) the vaccine "may be effective" in treating or preventing "a serious or life-threatening disease"; (2) "the known and potential benefits of the" vaccine "outweigh the known and potential risks of the" vaccine; and (3) "there is no adequate, approved, and available alternative." *Id.*

In June 2020, the FDA issued guidance giving COVID-19 vaccine developers parameters about what the agency would require to meet these statutory standards for an emergency use authorization. Critically, the FDA stated it "would expect that a COVID-19 vaccine would prevent disease or decrease its severity in at least 50% of people who are vaccinated." Food & Drug Admin., *Coronavirus (COVID-19) Update: FDA Takes Action to Help Facilitate Timely Development of Safe, Effective COVID-19 Vaccines* (June 30, 2020),

13

https://perma.cc/VM7A-C9NY. This 50% benchmark refers to *relative* risk reduction.[5]

Applying its guidance, on December 11, 2020, the FDA authorized Pfizer's COVID-19 vaccine for emergency use in individuals 16 years of age and older. ROA.56 ¶48. The FDA's press release explained that "the available safety and effectiveness data support the authorization" of Pfizer's vaccine "because the vaccine's known and potential benefits clearly outweigh its known and potential health risks." U.S. Food & Drug Admin., *FDA Takes Action in Fight Against COVID-19 By Issuing Emergency Use Authorization for First COVID-19 Vaccine* (Dec. 11, 2020), https://perma.cc/ZQ2K-RYTJ ("December 2020 Press Release").

The FDA expressly touted the Pfizer vaccine's 95% efficacy in the Landmark Study expressed in terms of *relative* risk reduction:

> Among [trial] participants, 18,198 received the vaccine and 18,325 received placebo. The vaccine was *95% effective* in preventing COVID-19 disease among these clinical trial participants with eight COVID-19 cases in the vaccine group and 162 in the placebo group.

---

[5] If the FDA had required 50% *absolute* risk reduction, no COVID-19 vaccine could have met this threshold. That is because it is impossible to reduce absolute risk by more than the original risk level. To have a 50% *absolute* risk reduction, then, the risk level of an unvaccinated person contracting COVID-19 in a clinical trial would have to be at least 50%. *See* ROA.56 ¶45 (providing absolute risk reduction equation). Even as COVID-19 ravaged across the country, the disease never reached such an incredibly high level of prevalence.

14

*Id.* (emphasis added). The FDA's emphasis on the 95% relative risk reduction makes sense because it easily surpassed the agency's 50% efficacy requirement.

Soon after receiving emergency use authorization, Pfizer shipped the first batches of its COVID-19 vaccine to the Department of Defense. Ben Guarino et al., *'The Weapon That Will End the War': First Coronavirus Vaccine Shots Given Outside of Trials in U.S.*, WASH. POST (Dec. 14, 2020), https://perma.cc/TYK7-UW7X. The government then provided the vaccine to the American people free of charge. Ctrs. for Medicare & Medicaid Servs., *Trump Admin. Acts to Ensure Coverage of Life-Saving COVID-19 Vaccines & Therapeutics* (Nov. 13, 2020), https://perma.cc/37LR-2WMU.

### 5. Pfizer made public statements about its COVID-19 vaccine and completed the clinical trial, leading to full FDA approval.

The millions of vaccine doses that the federal government provided for free to the American people saved lives. Consistent with the federal government's effort to encourage vaccination and the public's need for information during a public health crisis, Pfizer made public statements about the vaccine's efficacy, including statements that the vaccine showed 95% efficacy. ROA.59-60 ¶¶60-61. This was the same statistic Pfizer reported to the FDA in Pfizer's application for an emergency use authorization. ROA.54-55 ¶44. And it was the same statistic that the FDA cited in its press release announcing the emergency use authorization. *See supra* p.14.

At the same time Pfizer made these statements, it continued its large-scale clinical trial to obtain full FDA approval. Pfizer issued a press release on April 1, 2021, stating that, based on its clinical trial "with more than 12,000 vaccinated participants having at least six months follow-up after their second dose," "the vaccine was "highly effective . . . [as] measured seven days through up to six months after the second dose." Pfizer, *Pfizer and BioNTech Confirm High Efficacy and No Serious Safety Concerns Through Up to Six Months Following Second Dose in Updated Topline Analysis of Landmark COVID-19 Vaccine Study* (Apr. 1, 2021), https://perma.cc/Q9XJ-5KA8 (cited at ROA.64 ¶77). Pfizer also addressed the efficacy of the vaccine against the Delta variant, ROA.66-67 ¶88, around the same time that the FDA issued a statement that COVID-19 vaccines "continue to be remarkably effective in reducing risk of severe disease, hospitalization, and death, even against the widely circulating Delta variant," U.S. Food & Drug Admin, *Joint Statement from HHS Public Health and Medical Experts on COVID-19 Booster Shots* (Aug. 18, 2021), https://perma.cc/E7S3-UBPC.

The FDA fully approved Pfizer's vaccine for the prevention of COVID-19 disease in individuals 16 years of age and older on August 23, 2021, under the brand name "Comirnaty." U.S. Food & Drug Admin., *FDA Approves First COVID-19 Vaccine* (Aug. 23, 2021), https://perma.cc/L2KR-LW6K. To this day, this approval remains in effect.

## B. Procedural history.

In November 2023, the State of Texas filed this suit, alleging that Pfizer violated the Texas DTPA.

The State alleges that Pfizer made four categories of misrepresentations about the efficacy of its COVID-19 vaccine that "caused injury, loss, and damage to [the State]." ROA.43 ¶8. First, it alleges Pfizer misrepresented the efficacy of the vaccine by touting the very same 95% relative risk reduction statistic that both met the FDA's own guidance for issuing an emergency use authorization and that the FDA itself cited when granting Pfizer's emergency use authorization. ROA.87-88 ¶¶154-56. Second, the State alleges Pfizer misrepresented the "durability of protection" of the vaccine. ROA.88 ¶¶157-60. Third, the State alleges Pfizer misrepresented the vaccine's ability to prevent "transmission" between persons. ROA.88-89 ¶¶161-64. And fourth, it alleges that Pfizer misrepresented the vaccine's "efficacy against COVID-19 variants—in particular, the Delta variant." ROA.89 ¶¶165-69. Additionally, the State alleges Pfizer engaged in "a scheme to conceal vaccine underperformance" by "censor[ing] persons who sought to disseminate" different information about Pfizer's vaccine. ROA.89 ¶¶168-70 (capitalization altered).[6]

---

[6] These allegations that Pfizer overstated vaccine's effectiveness place Texas in the unusual position of contradicting statements by its own Department of State Health Services, the agency entrusted with protecting Texans' public health. *See, e.g.*, Tex. Dep't of State Health Servs., *Reducing Vaccine-Preventable Disease in Texas: Strategies to Increase Vaccine Coverage Levels* (Dec. 2022),

As a remedy, the State requests "restitution, damages, or civil penalties," as well as an injunction prohibiting Pfizer from making similar representations. ROA.90 ¶¶172-174.

Pfizer moved to dismiss the State's claims under Rule 12(b)(6) after removing this case to federal court. Pfizer argued, among other things, that: (1) the PREP Act provides Pfizer immunity against the State's claims; (2) the PREP Act expressly preempts the State's claims; (3) the FDCA also preempts the State's claims; and (4) the State failed to state a DTPA claim because none of the alleged misrepresentations are connected to "any trade or commerce" or "consumer transaction." ROA.265-80. The State opposed this motion. ROA.342-74.

The district court granted Pfizer's motion to dismiss. The court ruled Pfizer was entitled to immunity under the PREP Act, both the PREP Act and the FDCA preempted these claims, and Texas failed to state claims under the DTPA. ROA.842-43.

## SUMMARY OF THE ARGUMENT

**I.A.** The PREP Act immunizes Pfizer from the State's claims. The PREP Act immunizes Pfizer from "all claims for loss caused by, arising out of, relating to, or resulting from the administration to or the use by an individual

---

https://perma.cc/84MB-DDC6 (recommending "the COVID-19 vaccine as the primary preventive treatment to reduce severe COVID-19 symptoms and hospitalizations").

of" the Pfizer vaccine. 42 U.S.C. § 247d-6d(a)(1). This broad immunity plainly captures the State's DTPA claims alleging that Pfizer misrepresented the effectiveness of the vaccine because these claims both are (1) "claims for loss" and (2) "relat[e] to" the administration of the vaccine.

Needless to say, *the State* itself could not take a vaccine. So the State's claims are instead built on Pfizer allegedly injuring *individual citizens* by deceiving them into taking Pfizer's vaccine. The State's complaint alleges that citizens are suffering from vaccine ineffectiveness, safety concerns, and distorted risk-benefit analyses—all of which plainly qualify as "losses" under the PREP Act's expansive definition of that term and "relat[e] to" the administration of the vaccine to individual state citizens. *See, e.g.*, ROA.84-85 ¶¶142-43; *see* ROA.62 ¶70; ROA.78 ¶125. Indeed, for the State even to bring this action *parens patriae*—as it has done—its claims must seek to remedy losses to individuals related to the vaccine. That is because suing in *parens patriae* requires a State to seek "to vindicate an injury to a 'sufficiently substantial segment of its population.'" *La. State*, 70 F.4th at 878. The State's invocation of *parens patriae* is thus an admission that its claims are "claims for loss" for which Pfizer is immune.

The State's contrary position that the immunity provision must except State enforcement actions because otherwise there could be no government enforcement actions of any kind (Br.28-31) is simply wrong. The PREP Act expressly exempts the *federal* government's enforcement rights from the

immunity provision. 42 U.S.C. § 247d-6d(f). Had Congress intended also to exempt *State* enforcement actions, it knew how to say so.

**B.** The PREP Act also expressly preempts the State's claims. The PREP Act preempts state-law claims that (1) "relate[] to" the "clinical testing or investigation," "marketing," or "promotion" of a vaccine and (2) are "*different from*, or in conflict with, any requirement applicable under *this section*"—that is, Section 247d-6d of Title 42 of the U.S. Code, which codifies the primary substantive provisions of the PREP Act. *Id.* § 247d-6d(b)(8) (emphases added). There is no dispute that the State's claims "relate[] to" the clinical testing, marketing and promotion of the Pfizer vaccine, as these claims all allege misrepresentations or censorship in the course of Pfizer publicly discussing its vaccine's effectiveness. ROA.87-89 ¶¶152-70.

The State's claims are also "different from" the "requirement[s]" in "this section"—*i.e.*, § 247d-6d. 42 U.S.C. § 247d-6d(b)(8)(A). One of the core "requirement[s]" of that section is its immunity provision, which provides both substantive and procedural requirements for any lawsuit against a vaccine manufacturer. The DTPA, however, imposes "different" substantive and procedural rules, and—if not preempted—would impose liability for claims against which defendants like Pfizer should be immune. Further, the PREP Act and the HHS Secretary's declaration are designed to "encourag[e]" the development and use of vaccines. *Id.* § 247d-6d(b)(6). Restraints and burdens found in the DTPA about what a manufacturer can say about its vaccine are "different from" the PREP Act's requirement. So they are preempted.

The State's only response is telling: It says that the DTPA's requirements are consistent with parts of *other* federal laws *beyond § 247d-6d*. In fact, the State's brief does not cite *anything* in § 247d-6d as imposing the same requirement as the Texas DTPA provisions on which the State relies. That makes perfect sense, as the PREP Act plainly preempts trade-practice claims "relat[ing] to" the "clinical testing," "marketing," or "promotion" of emergency vaccines. *Id.* § 247d-6d(b)(8)(B). With nothing to point to in § 247d-6d, the State relies on the "Covid-19 Consumer Protection Act" and "[Federal Trade Commission] Act" section 5. Br.21. But those are both entirely different pieces of legislation. They do not include any requirements imposed by "*this section*" and therefore are irrelevant to the express preemption analysis. *Id.* § 247d-6d(b)(8)(A) (emphasis added).

**II.** The FDCA independently preempts the State's claims. This Court has held "[t]here is no sense in which any action deemed appropriate by the [FDA], will later be judged insufficient in state court" or through a state cause of action. *Zyla*, 134 F.4th at 338 (cleaned up). But the State is using the DTPA to attack the FDA's exercise of its authority to grant an emergency use authorization for the Pfizer vaccine under 21 U.S.C. § 360bbb-3. The complaint alleges, for example, that the "COVID-19 vaccines are the miracle that wasn't," ROA.38, and that the decision to grant authorization was the result of "political pressure." ROA.77 ¶123. The State's request to adjudicate these allegations is nothing less than a request for a court to "judge[] insufficient" the FDA's actions. *Zyla*, 134 F.4th at 338 (cleaned up).

The State also directly attacks the metric on which the FDA based its emergency use authorization: Pfizer's 95% relative risk reduction. ROA.87 ¶154. This represents exactly the type of forbidden second-guessing of federal agency decisions that conflict preemption prohibits. States have no authority to substitute their preferred metrics for those selected by FDA through its regulatory process, especially where, as here, the State does not dispute that the at-issue metric is *accurate*. Indeed, allowing states to second-guess FDA decisions on emergency authorization years after the fact would only incentivize vaccine producers to wait to apply for an emergency use authorization until they are confident that their clinical testing data will satisfy not only the FDA, but every government official and every private individual. That is not what Congress intended.

**III.A.** The State has also failed to state a claim under the Texas DTPA. The DTPA's express purpose is to "protect consumers in consumer transactions." *Amstadt*, 919 S.W.2d at 649. So to state a DTPA claim, any alleged misrepresentation must be connected with a "consumer transaction." *Id*. That is not the case for the alleged misrepresentations, as they were not part of any "consumer transaction" at all. The federal government providing the Pfizer vaccine to individuals for free, which happened here, is not a consumer transaction covered by the DTPA, because the doses were "provided gratuitously." *Rayford*, 73 S.W.3d at 411. Nor is Pfizer's sale of the vaccine to the federal government an actionable transaction under the DTPA because

the statute excludes the federal government from its definition of "consumer." *See* Tex. Bus. & Com. Code § 17.45(4).

**B.** The State's claims also fail because they do not allege misleading statements "in the conduct of any trade or commerce." *Id.* § 17.46(a). For a misrepresentation to be in the conduct of "trade or commerce," there must be a transaction for value—not a gratuitous provision of a product, such as this vaccine. *See id.* § 17.45(6) (defining "trade or commerce" as "the advertising, offering for sale, sale, lease, or distribution of any good or service"). Here, individuals received the vaccine from the federal government free of charge. That is fatal to the State's DTPA claims. Indeed, the caselaw cited by the State reaffirms there must be a transaction for value to state a DTPA claim.

## STANDARD OF REVIEW

The Court reviews de novo an order dismissing claims under Rule 12(b)(6). *Pie Dev.*, 128 F.4th at 661.

## ARGUMENT

## I. The federal Public Readiness and Emergency Preparedness (PREP) Act both grants Pfizer immunity against the State's claims and preempts them.

The PREP Act includes both an immunity and an express preemption provision. Each independently blocks the State's claims here.[7]

---

[7] Congress deliberately included both PREP Act provisions because they serve different purposes. The immunity provision provides complete immunity from suit, along with a right to an immediate appeal. *See Hampton v.*

### A. The PREP Act immunizes Pfizer from the State's claims, because they are "claims for loss . . . relating to . . . the administration" of Pfizer's vaccine to individuals.

The PREP Act's plain text grants broad immunity from suit and liability:

> Subject to the other provisions of this section, a covered person shall be immune from suit and liability under Federal and State law with respect to all claims for loss caused by, arising out of, relating to, or resulting from the administration to or the use by an individual of a covered countermeasure if a declaration under subsection (b) has been issued with respect to such countermeasure.

42 U.S.C. § 247d-6d(a)(1).

Pfizer is entitled to immunity under this provision. The State alleges (1) "claims for loss" that (2) "relat[e] to" the "administration" of Pfizer's vaccine to individuals.[8]

_____

*California*, 83 F.4th 754, 762 (9th Cir. 2023) (holding that the denial of PREP Act immunity is an "appealable collateral order"); *Maney v. Brown*, 91 F.4th 1296, 1299 (9th Cir. 2024) (same). The express preemption provision provides an affirmative defense that is broader in scope but without an immediate appellate right. *See* Preemption of State and Local Requirements Under a PREP Act Declaration, 2021 WL 298368, at *6 (O.L.C. Jan. 19, 2021) ("2021 OLC Op.") (concluding PREP Act preemption is broader than immunity).

[8] Texas does not dispute that the other elements of this immunity provision are satisfied. Pfizer is a "[c]overed [p]erson," its vaccine is a "[c]overed [c]ountermeasure," and the HHS Secretary issued a declaration covering the Pfizer vaccine. *See* 85 Fed. Reg. 15,198, 15,201-02 (HHS declaration).

1. **The State asserts "claims for loss" because it alleges harms to state citizens and seeks damages and restitution to remedy those harms.**

The State alleges "claims for loss" under a straightforward reading of that statutory term. Indeed, the complaint asserts on its face that Pfizer's representations about the COVID-19 vaccine "caused injury, loss, and damage" to the State. ROA.43 ¶8.

A "loss" is any "undesirable outcome of a risk." *Loss*, Black's Law Dictionary (12th ed. 2024). And the PREP Act specifically states that "[f]or purposes of this section, the term 'loss' means *any type* of loss." 42 U.S.C. § 247d-6d(a)(2)(A) (emphasis added). "'[A]ny' has an expansive meaning, that is, one or some indiscriminately of whatever kind." *Lexon Ins. Co., Inc. v. Fed. Deposit Ins. Corp.*, 7 F.4th 315, 323 (5th Cir. 2021) (cleaned up). Moreover, "*all* claims for loss" are within the scope of PREP Act immunity. 42 U.S.C. § 247d-6d(a)(1) (emphasis added). Congress's "use of 'all' indicates a sweeping statutory reach." *Maney*, 91 F.4th at 1302 (citation omitted). The type of loss therefore does not matter—"any" and "all" types of loss are covered.

The PREP Act gives examples of immunized losses, "including . . . physical, mental, or emotional injury, illness, disability, or condition," the "fear of physical, mental, or emotional injury," and "loss of or damage to property, including business interruption loss." 42 U.S.C. § 247d-6d(a)(2)(A). These examples are illustrative, as "[t]he word 'includes' is usually a term of enlargement, and not of limitation." *Samantar v. Yousuf*, 560 U.S. 305, 317 n.10 (2010) (cleaned up). These examples do not limit the PREP Act's broad

provision of immunity for "any" undesirable outcome. 42 U.S.C. § 247d-6d(a)(2)(A). Rather, these examples demonstrate that "loss" is not restricted to personal injury, financial injury, or even actual (as opposed to "fear of") injury.

The State's claims allege "loss" related to the public taking the vaccine. In the State's own words, the "harm alleged" in the complaint "is that Pfizer's misrepresentations 'prevented and hindered the public from obtaining information material to properly balancing the benefits and risks of its vaccine' thus 'distorting the risk/benefit analysis in Pfizer's favor by artificially inflating the vaccine's perceived efficacy.'" Br.29 (quoting ROA.84 ¶141); *see* ROA.57 ¶50 (alleging that Pfizer's conduct "misl[ed] the public into" taking a vaccine, which it "believ[ed] . . . was substantially more effective than in reality"). Specifically, the State asserts that Pfizer's purported "misrepresentations," ROA.57 ¶50, and "censorship campaign," ROA.78 ¶125, led state citizens to take a vaccine that was not "95%" effective at preventing COVID-19 and its "transmission"; which did not have the "duration" of "protection" advertised; and which did not protect "against variants, including . . . the Delta variant," ROA.57 ¶50. These allegations describe "undesirable outcome[s]" for state citizens who took Pfizer's vaccine—that is, *loss*. *Loss,* Black's Law Dictionary (12th ed. 2024).

The complaint also alleges "safety concerns" related to individuals taking the vaccine. ROA.84-85 ¶¶142-43 (asserting that "[m]any of the deaths in Pfizer's" clinical trial" were a result of certain "cardiac conditions" (cleaned

up)). This is not only plainly a "loss," but it is a loss even under the State's improperly narrow definition of loss as "ailments that equate to the traditional definition of personal injury." Br.29. As explained above, the PREP Act's use of "loss" is not limited to a traditional definition of personal injury. *See supra* p.26. Regardless, the State's claims satisfy that standard, too, as they allege personal injuries or risk to state citizens taking the vaccine.

Texas' brief tries to avoid all this by asserting that it is suing merely in its *"parens patriae* capacity." Br.17, 30. This Court recently rejected a similar gambit by Texas. *See Paxton v. Dettelbach*, 105 F.4th 708, 715-16 (5th Cir. 2024). The argument fares no better here.

Texas asserts that when a State enforces "consumer protection statutes" in its own name, it proceeds *"parens patriae"* by "acting in a quasi-sovereign capacity on behalf of the public interest of its citizens."[9] Br.30 (citing *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel. Barez*, 458 U.S. 592, 602 (1982)). But when a State asserts a *"parens patriae"* interest "in the health and well-being" of "its residents in general," the State proceeds "in a representative capacity, to vindicate an *injury* to a *sufficiently substantial segment* of its population." *La. State*, 70 F.4th at 877-78 (emphases added) (citation omitted). This is a

---

[9] Texas' brief therefore does not assert either a purely "sovereign" or "proprietary" interest. *La. State*, 70 F.4th at 877 (discussing *Snapp*, 458 U.S. at 600-08).

"hard-and-fast limit[] on the *parens patriae* doctrine." *Harrison v. Jefferson Par. Sch. Bd.*, 78 F.4th 765, 772 (5th Cir. 2023).

The State's claims therefore presuppose widespread "injury" to its citizens, and "*more* must be alleged than injury to an identifiable group of individual residents." *Snapp*, 458 U.S. at 607 (emphasis added). For example, *Snapp* found Puerto Rico could proceed *parens patriae* based on an injury to "the *entire* Puerto Rican labor force." *Paxton*, 105 F.4th at 715 (discussing *Snapp*). For Texas to proceed *parens patriae* here, it must establish widespread injury—that is, "loss"—to its state citizens caused by Pfizer's COVID-19 vaccine representations. 42 U.S.C. § 247d-6d(a)(1). That puts these claims squarely within the PREP Act's immunity provision. *Id.*

Finally, the remedy sought by the State confirms that it asserts claims for loss. The State requests "restitution" and "damages." ROA.90 ¶¶172-174; *see* ROA.42 ¶4. But "damages" are awarded to compensate a party "for the *loss* suffered." *In re Nalle Plastics Family Ltd. P'ship*, 406 S.W.3d 168, 171-72 (Tex. 2013) (emphasis added) (citation omitted). And the State may seek restitution, under the DTPA, only to "restore . . . money or property . . . which may have been acquired" by means of any unlawful act or practice. Tex. Bus. & Com. Code § 17.50(b)(3); *see Cruz v. Andrews Restoration, Inc.*, 364 S.W.3d 817, 824-26 (Tex. 2012). The State's request for restitution therefore contemplates a "loss of . . . property" to individuals, because the State itself, of course, could not take the vaccine. 42 U.S.C. § 247d-6d(a)(2)(A).

It is no answer for the State to contend that the DTPA does not require the State "to prove" a loss in some circumstances. Br.29 (citing Tex. Bus. & Com. Code § 17.47(a)). On the facts here, the State must still prove a loss because it would be impossible for a court "to restore money or property . . . which may have been acquired by means of any unlawful act or practice" absent proof of loss, Tex. Bus. & Com. Code § 17.47(d)—and that is exactly the relief the State has demanded.

However the State's complaint is sliced, it raises "claims for loss." 42 U.S.C. § 247d-6d(a)(1).

> **2.  The State's claims "relat[e] to . . . the administration" of the Pfizer vaccine because they are premised on millions of individuals receiving the Pfizer vaccine in Texas.**

The State's claims also "relat[e] to . . . the administration" of Pfizer's vaccine to individuals, because they are premised on state citizens receiving the Pfizer vaccine because of alleged misrepresentations. *Id.* § 247d-6d(a)(1).

The PREP Act's immunity provision applies to all claims for loss "caused by, arising out of, relating to, or resulting from the administration to or the use by an individual of a covered countermeasure." *Id.* The phrase "relating to" is a "broad one," which ordinarily means "to stand in some relation; to have bearing or concern; to pertain; refer; to bring into association with or connection with." *Latiolais v. Huntington Ingalls, Inc.*, 951 F.3d 286, 292 (5th Cir. 2020) (en banc) (cleaned up); *see Nw., Inc. v. Ginsburg*, 572 U.S. 273, 284 (2014) (holding the term "relates to" in a federal express preemption

provision includes all claims that have "a connection with, or reference to" the regulated object). "Administration" means "to give (medicine or medical treatment) to someone." *Administer*, Black's Law Dictionary (12th ed. 2024).

The State's claims have a "connection with" and "refer" to the administration of the Pfizer vaccine to millions of state citizens. The entire premise of the State's complaint is that more citizens received the Pfizer vaccine because of Pfizer's alleged misrepresentations. *See, e.g.*, ROA.84 ¶140 ("As a result of Pfizer's unlawful misconduct, Pfizer immunized approximately 3.5 million people, in Texas."); ROA.84 ¶141 (alleging that Pfizer's actions "lulled" citizens "into misunderstanding and misperceiving the vaccine's actual level of effectiveness, and this flawed understanding inherently distorted the risk/benefit analysis in Pfizer's favor by artificially inflating the vaccine's perceived efficacy" such that more individuals took the vaccine); ROA.85 ¶144 ("Had the public known the truth about the efficacy of Pfizer's COVID-19 vaccine, a substantial portion would likely have opted for an alternative or foregone inoculation altogether.").

The State never explains how its claims are *not* "relate[d] to" administration of the Pfizer vaccine to individual state citizens. It argues instead that it is "not suing *about* 'administration' of the Pfizer vaccine," but rather about misrepresentations. Br.30 (emphasis added). That argument ignores the PREP Act's plain text. The text asks whether the claims "relat[e]" to the administration of the vaccine, not whether the claim is "about" the actual needle-into-arm administration of the vaccine. 42 U.S.C. § 247d-6d(a)(1). In fact,

the PREP Act contemplates that claims about misrepresentations are covered by the "related to" test wherever, as here, they have a "causal relationship with the . . . clinical testing or investigation, manufacture, and labeling" of a vaccine. *Id.* § 247d-6d(a)(2)(B). The State's argument that its claims cannot be about the administration of the vaccine to an individual because it is suing in its own name (Br.30) fails for all the reasons discussed above. *See supra* Part I.A.1.

### 3. The State's reading of the PREP Act is the reading that creates absurdities.

Finally, the State misfires by arguing that "if Pfizer is immune from the State's claims about misrepresentations, then not even the federal government—including FDA itself—could sue." Br.30-31. The PREP Act contains an express exception to immunity: It does not "abrogate or limit any right, remedy, or authority that the United States or any agency thereof may possess under any other provision of law." 42 U.S.C. § 247d-6d(f). (Pfizer raised this exception in its district court reply brief, ROA.411, yet the State's appellate brief still ignores it.) Moreover, a separate federal statute, the COVID-19 Consumer Protection Act (which the State itself cites, Br.7, 21), empowers the Federal Trade Commission to enforce Section 5(a) of the FTC Act with respect to deceptive practices "associated with" COVID-19. Pub. L. No. 116-260, § 1401(b)(1), 134 Stat 1182, 3275 (2020). The FTC therefore could bring suit in the State's fanciful hypothetical where a company misrepresents that its COVID-19 vaccine cures cancer.

It is the State's position—not Pfizer's—that "would lead to numerous absurdities." Br.30. There is no dispute that the PREP Act would immunize Pfizer from the claims here if individual state citizens had asserted them instead of the State. *See* Br.28 (conceding that the PREP Act "grants Pfizer immunity from personal injury claims from individuals"). This is because an individual asserting a DTPA claim that he was misled into receiving the vaccine would be required to allege a "loss" related to the "administration" of the Pfizer vaccine. *See Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 478 (Tex. 1995) (listing elements of DTPA claim, including a misrepresentation that is a "producing cause of the consumer's damages").[10]

It defies common sense that Congress would clearly immunize vaccine manufacturers from misrepresentation lawsuits brought by individuals, while *sub silentio* allowing States to bring similar actions presenting identical barriers to emergency vaccine production. The entire point of the PREP Act is to remove the "obstacle[] . . . of litigation" in emergencies. *See* President Bush Statement. Had Congress intended to allow States to bring *parens patriae* claims for state citizens' use of emergency medical treatments, it would have expressly preserved State enforcement authority—in the same way it preserved *federal* enforcement authority in 42 U.S.C. § 247d-6d(f). This shows

---

[10] *See, e.g.*, *Gibson v. Johnson & Johnson*, 2023 WL 4851413, at *6 (E.D. Pa. July 28, 2023) (granting 12(b)(6) motion to dismiss an individual plaintiff's claims relating to the COVID-19 vaccine based on PREP Act immunity); *Cowen v. Walgreen Co.*, 2022 WL 17640208, at *3 (N.D. Okla. Dec. 13, 2022) (same).

Congress knew how to preserve governmental authority to sue, yet it did not grant *State* governments that power under the PREP Act. *See Bartenwerfer v. Buckley*, 598 U.S. 69, 78 (2023) ("[W]hen Congress includes particular language in one section of a statute but omits it in another section of the same Act, [courts] generally take the choice to be deliberate." (citation omitted)).

### B. The PREP Act preempts the State's claims because they enforce state laws that are "different from" the "requirements" in "*this section*"—that is, 42 U.S.C. § 247d-6d.

The PREP Act's express preemption provision independently bars the State's claims:

> [N]o State or political subdivision of a State may establish, *enforce*, or continue in effect with respect to a covered countermeasure any provision of law or legal requirement that—
>
> > (A) is *different from*, or is in conflict with, any requirement applicable under *this section*; and
> >
> > (B) relates to the design, development, *clinical testing or investigation*, formulation, manufacture, distribution, sale, donation, purpose, purchase, *marketing*, *promotion*, packaging, labeling, licensing, use, *any other aspect of safety or efficacy*, or the prescribing, dispensing, or administration by qualified persons of the covered countermeasure, or to any matter included in a requirement applicable to the covered countermeasure under this section or any other provision of this chapter, or under the Federal Food, Drug, and Cosmetic Act.

42 U.S.C. § 247d-6d(b)(8) (emphases added).

There is no dispute that the State's claims satisfy the second subsection of this express preemption provision. *See* Br.20-23. The State's claims allege Pfizer made misrepresentations "relate[d] to" the "safety or efficacy" of the vaccine, including its "clinical testing or investigation," "marketing," and "promotion." 42 U.S.C. § 247d-6d(b)(8)(B).

The State's claims also satisfy the first subsection—the only element of preemption at issue—because they impose "requirement[s]" "different from," or "in conflict with," the "requirement[s]" of "this section"—that is, § 247d-6d. *Id.* § 247d-6d(b)(8).

### 1. The Texas Deceptive Trade Practices Act imposes "requirement[s]" that are "different from," or "in conflict with," the "requirement[s] applicable under *this section*"—42 U.S.C. § 247d-6d.

The PREP Act preempts a state-law obligation if it is "different from, or in conflict with, any requirement applicable under this section"—that is, § 247d-6d. *Id.* § 247d-6d(b)(8)(A). The State's brief repeatedly ignores the PREP Act's plain text, which requires examining whether state-law requirements are different from requirements of "this section." *Id.* This is fatal to the State's arguments. A comparison between the PREP Act's and DTPA's requirements shows the State's claims are preempted because the Texas DTPA imposes requirements "different from" the PREP Act's. *Id.*

**a.** The most important "requirement applicable under *this section*" is the PREP Act's immunity provision.

A "requirement" is any legal obligation—"[s]omething that must be done because of a law or rule." *Requirement*, Black's Law Dictionary (12th ed. 2024); *see Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 444-45 (2005) (construing "requirements" to mean "a rule of law that must be obeyed"). The PREP Act's immunity provision is thus a "requirement" of § 247d-6d, because anyone who satisfies its terms "must be" immune from suit "because of a law or rule." *See* 42 U.S.C. § 247d-6d(a). As the U.S. Department of Justice's Office of Legal Counsel explained while analyzing the PREP Act: "The requirements 'applicable under' this section include . . . obligations flowing directly from the PREP Act itself, such as immunity from 'claims for loss.'" 2021 OLC Op., 2021 WL298368 at *4.

Section 247d-6d also creates both substantive and procedural "requirements" for suits that escape immunity. Substantively, it provides that the "sole exception to the immunity from suit and liability" for suits not brought by the federal government is "an exclusive Federal cause of action against a covered person for *death or serious physical injury proximately caused by willful misconduct*." 42 U.S.C. § 247d-6d(d)(1) (emphasis added). Procedurally, it creates requirements regarding venue, choice of law, pleading standards, discovery, and damages limits. *See id.* § 247d-6d(e)(1) (obligating plaintiffs to file any claims in "United States District Court for the District of Columbia."); *id.* § 247d-6d(e)(2) (requiring application of the "substantive law . . . of the State in which the alleged willful misconduct occurred"); *id.* § 247d-6d(e)(3) (requiring "[p]leading with particularity"); § 247d-6d(e)(6) (creating

requirements for the timing and standards for "[c]ivil discovery"); *id.* § 247d-6d(e)(7) (limiting "damages").

Further, the "requirements applicable under this section" are not limited to the requirements expressly stated in the statutory text. As the Office of Legal Counsel has explained, the "terms and conditions contained within the declarations issued by the [HHS] Secretary," triggering the availability of emergency public health resources under § 247d-6d(b)(1), also constitute substantive legal obligations under "this section." 2021 OLC Op., 2021 WL 298368, at *1, 4. After all, the HHS Secretary's declaration triggers the PREP Act's legal requirements. The declaration's terms and conditions "encourage[]" the covered behavior, such as the development, clinical trials, marketing, promotion, and use of vaccines. *Id.* at *6; *see* 42 U.S.C. § 247d-6d(b)(6).

**b.** The Texas DTPA imposes very different requirements from § 247d-6d of the PREP Act.

The DTPA imposes requirements as to what a manufacturer like Pfizer can say about a vaccine. *See generally* Tex. Bus. & Com. Code §§ 17.41, *et seq.* It authorizes liability wherever a company "is engaging in, has engaged in, or is about to engage in any act or practice declared to be unlawful" by the DTPA. *Id.* §§ 17.47(a), 17.46(a)-(b). And it declares unlawful "false, misleading, or deceptive acts or practices," *id.* § 17.46(b), including statements "representing that goods or services have . . . characteristics . . . which they do not have," *id.* § 17.46(b)(5), or "representing that goods or services are of a particular standard [or] quality," *id.* § 17.46(b)(7).

These requirements are miles beyond the PREP Act's requirements, which do not limit how a company may discuss a product that is covered by an HHS Secretary declaration.[11] The federal statute provides *immunity* for claims that have a "relationship with the design, development, clinical testing or investigation, manufacture, labeling, distribution, formulation, packaging, *marketing*, *promotion*, [or] sale" of a covered vaccine. 42 U.S.C. § 247d-6d(a)(2)(B) (emphasis added). Two laws plainly impose different "requirements" where one imposes liability for the same activities that the other immunizes.

Even where the PREP Act does impose requirements for suit, those requirements are very different from the DTPA's requirements. The PREP Act requires "death or serious physical injury proximately caused by willful misconduct" to bring an action. *Id.* § 247d-6d(d)(1). A DTPA action, by contrast, can be brought based on economic damages and need not prove intent to deceive. *See Miller v. Keyser*, 90 S.W.3d 712, 716 (Tex. 2002) ("A consumer is not required to prove intent to make a misrepresentation to recover under the DTPA."); *Brown v. Bank of Galveston, Nat'l Ass'n*, 963 S.W.2d 511, 513 (Tex. 1998) (explaining that a DTPA plaintiff need only show "actual damages"). The procedural requirements are even more different. For instance, the PREP

---

[11] As noted, this does not mean that there are no limits at all. It simply means that those limits are imposed by other federal laws enforceable by federal officials. *See supra* Part I.A.3.

Act requires suit in the U.S. District Court for the District of Columbia, *see supra* Part I.B.1.a.; the DTPA requires suit in "the district court of the county where the transaction occurred, or, on the consent of the parties, in a district court of Travis County," Tex. Bus. & Com. Code § 17.47(b). The DTPA, moreover, does not impose any pleading-with-particularity, verification, or three-judge-panel requirements. *See generally id.* §§ 17.41, *et seq*. The PREP Act does.

Furthermore, the DTPA's requirements burdening Pfizer's ability to speak about its COVID-19 vaccine are not only "different from," but in "conflict with," the HHS declaration's provisions seeking to encourage the development and use of the COVID-19 vaccine. As the Office of Legal Counsel explained when concluding the PREP Act preempted certain state-licensing requirements:

> [I]n issuing a PREP Act declaration, the Secretary must "consider the desirability of encouraging the . . . administration, licensing, and use of such counter measure[s]"—expressly indicating that a declaration is to encourage the covered behavior. [42 U.S.C.] § 247d-6d(b)(6). A state-law requirement that, in contrast, discourages such action by imposing prohibitive licensing requirements, or sanctions, or liability for enforcement actions is 'different from' or in 'conflict with' the declaration's textually indicated intended impact. *Id*. § 247d-6d(b)(8).

2021 OLC Op., 2021 WL 298368 at *6.

The same is true here. The DTPA's requirements—and in particular the State's attempted application of those requirements in this case to attack

statements about the vaccine's effectiveness—"discourage" the very actions that the HHS Secretary sought to encourage with his declaration. Those requirements are different from the requirements in the Secretary's declaration and are therefore preempted.

### 2.   The State ignores the PREP Act's unambiguous statutory text.

Rather than engage with the obvious differences between the PREP Act's requirements and the DTPA's requirements, the State tries to rewrite Congress's statute. The PREP Act's preemption provision requires courts to compare the asserted state law requirements to federal requirements "applicable under *this section*." 42 U.S.C. § 247d-6d(b)(8)(A) (emphasis added). The term "this section" clearly refers to the statutory section in which the preemption provision is located: § 247d-6d.

But the State's brief massively expands that text to: Under "*any federal laws.*" Br.21 (emphasis added). After rewriting the statute, the State proceeds to argue its DTPA claims "mirror[]" federal claims under other federal laws far beyond the PREP Act—namely, the "Covid-19 Consumer Protection Act" and "section 5(a) of the FTC Act." Br.21 (cleaned up). But neither the Covid-19 Consumer Protection Act nor section 5 of the FTC Act is part of "this section" or the PREP Act. *See* Consolidated Appropriations Act, Pub. L. No. 116-260, § 1401, 134 Stat. 1182, 3275 (2020) (Covid-19 Consumer Protection Act); 15 U.S.C. § 45 (Section 5 of the FTC Act). These distinct federal laws are thus irrelevant to the PREP Act's preemption analysis. The fact that the State's

brief has to cite these other federal statutes shows it has no argument that the DTPA imposes the same requirements as § 247d-6d.

Many of the cases on which the State relies further reflect its failure to grapple with the PREP Act's plain text. For example, the plain text of the express preemption provision in *Bates*, 544 U.S. at 449 (cited at Br.23), preempted requirements different from those found in "this *subchapter*"—not "this section." 7 U.S.C. § 136v(b) (emphasis added). The Court accordingly examined the requirements in the relevant subchapter—and nothing outside of that subchapter—to assess preemption. *Bates*, 544 U.S. at 447 (emphasis added). *Bates* therefore confirms that, here, the only requirements to examine are those found in § 247d-6d because that is what the statutory text directs.[12]

The State's reliance on *Medtronic, Inc. v. Lohr*, 518 U.S. 470 (1996) (Br.22), is similarly misplaced. Unlike in *Medtronic*, requirements already imposed by the federal law at issue (here, the PREP Act) are not a *subset* of the state-law claim. 518 U.S. at 495 (explaining that the plaintiffs' state-law cause of

---

[12] *Jacob v. Mentor Worldwide, LLC*, 40 F.4th 1329 (11th Cir. 2022) (cited at Br.22), is similar, as it too involved a preemption provision examining "any requirement . . . different from . . . any requirement applicable *under this chapter*," not "this section." 21 U.S.C. § 360k(a) (emphasis added). The court accordingly held that, because the plaintiff sought to enforce state law requirements that were "parallel" to requirements *in that chapter*—not to requirements found anywhere in the federal code—plaintiff's claims were not preempted. *Jacob*, 40 F.4th at 1337.

action imposed "requirements narrower, not broader, than the federal requirement" because the plaintiff not only needed to establish that the defendant "violated FDA regulations" but additional elements, like negligence). Rather, the State's claims seek to enforce requirements entirely foreign to the PREP Act's requirements. That is why the State's assertion that its "claims are premised on Pfizer's [alleged] disregard of FDA's explanation to Pfizer of what its data supported," Br.22, is off the mark. Even if the State's claims are premised on the FDA's statements to Pfizer, those statements are not "requirements" under § 247d-6d.

Because the State is not enforcing any requirements found in § 247d-6d, its claims are preempted. The State cannot escape this conclusion by invoking the presumption against preemption. *Cf.* Br.19. Although courts apply a "presumption against preemption" when a party argues that Congress *implicitly* preempted state law, no such presumption applies when a statute contains an *express* preemption provision, as the PREP Act does. As this Court has made clear, "when the statute contains an express preemption clause, the court does not indulge any presumption against preemption." *Young Conservatives of Tex. Found. v. Smatresk*, 73 F.4th 304, 311 (5th Cir. 2023) (internal quotation marks omitted); *contra.* Br.18-19. Instead, courts "focus[] on the plain wording of the clause, which necessarily contains the best evidence of Congress' preemptive intent." *Smatresk*, 73 F.4th at 311 (cleaned up). Here, that "plain wording" preempts the State's claims.

## II.  The federal Food, Drug, and Cosmetic Act (FDCA) also preempts the State's claims.

The State's claims are also preempted by the FDCA. When this Court recently addressed FDCA preemption, it confirmed that "[t]here is no sense in which any action 'deemed appropriate by the [FDA], will later be judged insufficient in state court'" or through a state cause of action. *Zyla*, 134 F.4th at 338 (quoting *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 351 (2001)). Yet that is what the State is attempting to do with this suit: Use state law to second guess the FDA's emergency use authorization for the Pfizer vaccine issued under the FDCA. *See* 21 U.S.C. § 360bbb-3.

State laws that "conflict with federal law are 'without effect.'" *Atria Grp., Inc. v. Good*, 555 U.S. 70, 76 (2008) (citation omitted). So even without an express preemption provision, a state law is preempted if it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hillsborough Cnty. v. Automated Med. Lab'ys., Inc.*, 471 U.S. 707, 713 (1985) (cleaned up). This includes when the state law, as applied, would disturb "the federal statutory scheme . . . used by the [FDA] to achieve a somewhat delicate balance of statutory objectives." *Buckman*, 531 U.S. at 348.

Conflict preemption bars the State's claims here, because they are just a backdoor attack on the FDA's decision to grant an emergency use authorization for the Pfizer vaccine. The very first sentence of the complaint makes that clear, alleging that "the COVID-19 vaccines are the miracle that wasn't."

ROA.38. The complaint then repeatedly alleges that the Pfizer vaccine is ineffective and unsafe, despite the FDA's emergency and full approval of the vaccine. For example, the State (absurdly) alleges that there was "negative vaccine efficacy in late 2021 and early 2022—meaning a greater percentage of vaccinated persons contracted, and even died from, COVID-19 than unvaccinated." ROA.40. Worse, it takes direct aim at the FDA, alleging that "[e]ven by [emergency use authorization] standards . . . Pfizer's data was remarkably weak," ROA.76 ¶119, and that the FDA acted "[u]nder political pressure from the White House," ROA.77 ¶123.

The State protests that it is not challenging the FDA's emergency use authorization decision, but rather Pfizer's alleged "misrepresentations to the public." Br.25 (cleaned up). But the State's claim that Pfizer misrepresented the vaccine's efficacy by discussing the 95% relative risk reduction metric, *see, e.g.*, ROA.87 ¶154, is nothing less than a challenge to the emergency use authorization itself. To approve a COVID-19 vaccine for emergency use under 21 U.S.C. § 360bbb-3, the FDA required manufacturers to show that their vaccine was at least 50% effective as expressed in terms of relative risk reduction. *See supra* p.13. That metric was necessary to allow the FDA to make the FDCA-required determination that the vaccine's risks "outweigh[ed]" its benefits. 21 U.S.C. § 360bbb-3(c). So when Pfizer's vaccine undisputedly showed a 95% relative risk reduction in a clinical trial, the FDA authorized

its emergency use and issued a public statement that the vaccine satisfied this important threshold. *See* December 2020 Press Release.[13]

The State's argument that the 95% relative risk reduction figure—a figure the State concedes is *accurate* (Br.2)—was misleading therefore asks a court to hold "insufficient" an action "deemed appropriate by the" FDA, namely, the decision to use the relative risk reduction metric and grant an emergency use authorization based on that figure. *Zyla*, 134 F.4th at 338. That is precisely the type of claim that is conflict-preempted by the FDCA. Indeed, this claim is little different from a claim alleging that a company provided fraudulent information to the FDA, and those claims are preempted because "[t]he States ha[ve] no role . . . in 'policing fraud against federal agencies.'" *Id.* at 337 (quoting *Buckman*, 531 U.S. at 338). The State simply has no role in second-guessing the benchmarks and metrics the FDA sets and acts upon.

Further, the State's claims disturb "the federal statutory scheme," which contemplates the FDA granting emergency use authorizations expeditiously. *Buckman*, 531 U.S. at 348. Pursuant to its authority under the FDCA, the FDA determined that evaluating the COVID-19 vaccine's efficacy in

---

[13] The State argues that the FDA's public communications endorsing the 95% metric are irrelevant because only agency action "with the force of law can pre-empt conflicting state requirements." Br.27 (internal quotation marks omitted). This misses the point. The State's claims are preempted because they challenge the 95% metric that is the basis for the FDA's emergency use authorization under 21 U.S.C. § 360bbb-3. The public communications just confirm this.

terms of relative risk reduction would allow the agency to most efficiently determine whether the vaccine's risks "outweigh[ed]" its benefits. 21 U.S.C. § 360bbb-39(c). But the State now seeks to hold Pfizer liable for complying with the FDA's command. That is perverse. Moreover, allowing such claims would cause "harmful delays" and "deter applicants," like Pfizer, "from seeking FDA approval" based on compliance with the agency's stated requirements. *Zyla*, 134 F.4th at 338. And those delays would "stand as an obstacle to the accomplishment and execution of the full purposes and objectives" for which Congress provided the emergency use authorization process. *Hillsborough Cnty.*, 471 U.S. at 713.

The State's reliance on *Wyeth v. Levine* is misplaced because, unlike here, the requirements imposed by the state tort claims in *Wyeth* furthered the objectives of the FDCA's statutory scheme. *See* 555 U.S. 555, 573-74 (2009). There, a drug manufacturer failed to update its FDA-approved warning label after new data showed that the drug was linked to previously unknown side effects. *Id.* at 561, 579. A plaintiff who experienced those side effects then brought failure-to-warn claims against the manufacturer. *Id.* at 558. The manufacturer argued that the FDCA preempted those claims because the FDA had not authorized an update to the warning label. *Id.* at 574. But the Supreme Court rejected that argument, explaining that the FDCA established only the "minimal standards" for drug labeling, and that states were free to impose "additional standards" because such requirements "strengthen[ed]" warnings and therefore furthered the FDCA's "drug

45

safety" objectives. *Id.* at 573, 575, 578-79. *Wyeth* is thus far different from this case, where the State's claims would displace—not supplement—the FDA's judgment.

## III. The State failed to state claims under the Texas Deceptive Trade Practices Act (DTPA).

The State also failed to state DTPA claims as a matter of law, for at least two reasons: The claims do not allege deceptive conduct in connection with a "consumer transaction," and they do not allege deceptive conduct connected to "trade" or "commerce."

### A. The State failed to allege misrepresentations in connection with a "consumer transaction" involving Pfizer, because state citizens obtained Pfizer's vaccine from the federal government for free.

None of Pfizer's alleged conduct was done in connection with "a consumer transaction." *Amstadt*, 919 S.W.2d at 649. That dooms the State's claims because the Texas Supreme Court has held that, for a plaintiff to maintain a DTPA claim, "the defendant's deceptive conduct must occur in connection with a consumer transaction." *Id.*; *see Todd v. Perry Homes*, 156 S.W.3d 919, 922 (Tex. App.–Dallas 2005, no pet.) (same); *Brittan Commc'ns Int'l Corp. v. Sw. Bell Telephone Co.*, 313 F.3d 899, 907 (5th Cir. 2002) (same).

The federal government's provision of the Pfizer vaccine to individuals for free was not a "consumer transaction." The DTPA defines "consumer" as "an individual, partnership, corporation, this state, or a subdivision or

agency of this state who seeks or acquires *by purchase or lease*, any goods or services." Tex. Bus. & Com. Code § 17.45(4) (emphasis added). A recipient of goods or services "provided gratuitously" (not by "purchase or lease") is therefore "not a consumer within the meaning of the DTPA." *Rayford*, 73 S.W.3d at 411; *see Montalvo v. Bank of Am. Corp.*, 864 F. Supp. 2d 567, 580 (W.D. Tex. 2012) (similar); *Word of Faith Outreach Ctr. Church, Inc. v. Morales*, 787 F. Supp. 689, 697 (W.D. Tex. 1992) ("[T]he reading of the DTPA as a whole makes it clear that the Texas legislature was concerned with 'business,' not gratuitous transactions."), *rev'd on other grounds*, 986 F.2d 962 (5th Cir. 1993). Because state citizens—like all Americans—received the Pfizer vaccine free of charge, they are not "consumer[s]" of the Pfizer COVID-19 vaccine for purposes of the DTPA.

The federal government's purchase of the vaccine from Pfizer also is not a "consumer transaction" under the DTPA. The DTPA's definition of "consumer" neither mentions the United States nor its subdivisions or agencies. *See* Tex. Bus. & Com. Code § 17.45(4). The Texas Legislature knew how to include government entities in that definition when it wanted. For instance, the definition of "consumer" includes the *State*, its "subdivision[s]," and its "agenc[ies]." *Id.* The Legislature chose to omit the federal government from its definition of "consumer," and courts may not rewrite that definition to add it. *See Hogan v. Zoanni*, 627 S.W.3d 163, 169 (Tex. 2021) ("[W]e presume the Legislature chose statutory language deliberately and purposefully, and

that it likewise excluded language deliberately and purposefully." (cleaned up)).

Because the State effectively concedes—as it must—that its claims are not in connection with any "consumer transaction," it denies the existence of this legal requirement altogether. It argues that claims do not have to be in connection with a consumer transaction *when the State is the plaintiff*. Br.36. Nothing in the DTPA supports this argument.

The DTPA's primary purpose is to "protect *consumers* against false, misleading, and deceptive business practices." Tex. Bus. & Com. Code § 17.44(a) (emphasis added). That is why the Texas Supreme Court held that "deceptive conduct" must be "in connection with a consumer transaction" to be actionable. *Amstadt*, 919 S.W.2d at 649. As the Court explained, "[d]espite [the DTPA's] broad, overlapping prohibitions, we must keep in mind why the Legislature created this simple, mechanical cause of action: to protect *consumers* in *consumer transactions*." *Id*. (emphasis added). It makes no sense, then, for the State to argue that it can bring a DTPA claim that has no connection to any consumer transaction. As with the PREP Act's immunity provision, *see supra* Part I.A., the State cannot circumvent the DTPA's substantive legal requirements so easily.

It makes no difference that the State brought its claims under § 17.47 of the DTPA. *Cf.* Br.36-37. Section 17.47 limits the State's Consumer Protection Division to bringing actions only for "any act or practice declared to be *unlawful*" under the DTPA. Tex. Bus. & Com. Code § 17.47(a) (emphasis

added); *see Household Retail Servs., Inc. v. State*, 2001 WL 984779, at *3 n.4 (Tex. App.–San Antonio Aug. 29, 2001, no pet.) (explaining that the State may only bring "an action to prevent a party from engaging in a violation of the DTPA with respect to trade or commerce as defined in the statute"). But an act is not unlawful under the DTPA unless it is done in connection with a "consumer transaction." *Amstadt*, 919 S.W.2d at 649. Thus, although the State may sometimes sue as a non-consumer under that section, *see Riverside Nat'l Bank v. Lewis*, 603 S.W.2d 169, 173 (Tex. 1980), that does not eliminate the "consumer transaction" requirement, *Amstadt*, 919 S.W.2d at 649.

The other cases the State cites reinforce this "consumer transaction" requirement. In *Flenniken v. Longview Bank & Trust Co.* (cited at Br.35), for example, the Texas Supreme Court allowed the plaintiffs' DTPA claims to proceed only because they had a "relationship to a [consumer] transaction." 661 S.W.2d 705, 707 (Tex. 1983). Although the plaintiffs did not have a "contractual relationship with the defendant" bank, their claims were inextricably connected to their contract to purchase a builder's services. *Id.* at 707. The plaintiffs therefore satisfied the DTPA's requirement that claims connect to a consumer transaction. *Id.* Here, however, the State has failed to allege any consumer transaction connected to its claims.

## B. The alleged misrepresentations are not connected to "trade" or "commerce."

The State's DTPA claims independently fail because they do not allege misrepresentations in connection with "trade" or "commerce." Tex. Bus. &

Com. Code § 17.46(a). The State instead alleges misrepresentations only in connection with the federal government providing the Pfizer vaccine to the public for *free*—and that is not trade or commerce under Texas law.

Courts apply the "common, ordinary meaning" of statutory terms "unless a more precise definition is apparent from the statutory context or the plain meaning yields an absurd result." *Camacho v. Ford Motor Co.*, 993 F.3d 308, 311 (5th Cir. 2021). And courts "typically look first to dictionary definitions" to determine the ordinary meaning of undefined statutory terms. *Fort Worth Transp. Auth. v. Rodriguez*, 547 S.W.3d 830, 838 (Tex. 2018).

The DTPA makes it unlawful for a person to engage in "[f]alse, misleading, or deceptive acts or practices in the conduct of any trade or commerce." Tex. Bus. & Com. Code § 17.46(a). It then defines "'trade' or 'commerce'" to mean "the advertising, offering for sale, sale, lease, or distribution of any good or service, of any property, tangible or intangible, real, personal, or mixed, and any other article, commodity, or thing of value, wherever situated[.]" *Id*. § 17.45(6).

This definition makes clear that only those transactions involving an exchange of value qualify as "trade or commerce," because each component of the statutory definition requires an exchange of value. "Advertising" means "drawing the public's attention to something to promote its *sale*." *Advertising*, Black's Law Dictionary (12th ed. 2024). "Sale" means "[t]he transfer of property or title *for a price*." *Sale*, Black's Law Dictionary (12th ed. 2024) (emphasis added). Indeed, the Texas Supreme Court has endorsed this

50

definition of "sale" when interpreting Texas law. *See Ford Motor Co. v. Parks*, 691 S.W.3d 475, 481 (Tex. 2024) (holding that "sale" in the context of a statute of repose means "the transfer of property or title for a price"). Similarly, "lease," in the context of personal property, refers to a "contract by which the [] possessor . . . conveys the right to use that property *in exchange for consideration*." *Lease*, Black's Law Dictionary (12th ed. 2024) (emphasis added).

Context also confirms that "distribution" cannot mean giving out a product or service for free, since it follows the terms "advertising," "lease," and "sale" that all require an exchange of value. *See Greater Hou. P'Ship v. Paxton*, 468 S.W.3d 51, 61 (Tex. 2015) ("[T]he meaning of a word or phrase, especially one in a list, should be known by the words immediately surrounding it."). In isolation, the definition of "distribution" may not always expressly include an exchange for value. *See Distribution*, Black's Law Dictionary (12th ed. 2024) ("[t]he act or process of apportioning or giving out" something). But context matters, and these statutory terms must be interpreted in tandem with their surrounding text. *See Greater Hou.*, 468 S.W.3d at 61. This constraint is confirmed by the ordinary meanings of "trade" and "commerce," both of which require an exchange of value. *Trade*, Black's Law Dictionary (12th ed. 2024) ("[t]he business of *buying and selling* or bartering goods or services" (emphasis added)); *Commerce*, Black's Law Dictionary (12th ed. 2024) (the "*exchange* of goods and services," especially "on a large scale involving transportation between cities, states, and countries" (emphasis added)).

Because the DTPA applies only to misrepresentations made in connection with an exchange of value, the State's claims fail as a matter of law. *See supra* Part III.A. Although the complaint identifies various Pfizer statements that were, in the State's view, "false, misleading or deceptive," none of those statements were made in connection with the transfer of the vaccine to Texas consumers "for a price," *Sale*, Black's Law Dictionary (12th ed. 2024), or "in exchange for consideration," *Lease*, Black's Law Dictionary (12th ed. 2024); *see Commerce*, Black's Law Dictionary (12th ed. 2024). Nor did state citizens "buy[]" the vaccine from Pfizer. *Trade*, Black's Law Dictionary (12th ed. 2024). Instead, at the time Pfizer made those statements to the public, only the *federal government* had contracted with Pfizer to purchase the vaccine. And those doses were not for sale to individual citizens—they were provided to the public free of charge. *See* ROA.57 ¶53, ROA.86 ¶151; Br.33.

The State never grapples with any of this, completely ignoring cases holding that recipients of goods or services "provided gratuitously" cannot bring DTPA claims. *See supra* Part III.A.; Br.33-34. It instead insists that caselaw—namely, *Mother & Unborn Baby Care of N. Tex., Inc. v. State*, 749 S.W.2d 533 (Tex. App.—Ft. Worth 1988, writ denied)—supports the idea that "goods or services provided for free can still violate the DTPA." Br.33.

But *Mother* held that the plaintiffs could bring claims under the DTPA only because they had *sought* "to purchase a service." *Id.* at 548. In that case, the plaintiffs alleged that a facility had misled them and other women into believing it offered abortion services when it offered only free pregnancy

tests and counseling against abortion. *Id.* at 546. The court held that just because no value had exchanged hands between the plaintiff and the facility, that did not prevent a DTPA claim because the women were "*seeking to purchase* a service upon which this complaint is based." *Id.* at 548 (emphasis added). In reaching this conclusion, the court cited *Martin v. Lou Poliquin Enterprises, Inc.*, which held that the DTPA applies when "a person *intended* to purchase or lease the goods or services in question." 696 S.W.2d 180, 183-84 (Tex. App.—Houston [14th Dist.] 1985, writ ref'd n.r.e.). *Mother* thus stands only for the proposition that the DTPA may apply to claims arising out of *attempted* consumer transactions. That is not this case: Here, no one attempted to purchase Pfizer's vaccine because everyone knew the federal government was providing it for free.

Recognizing these problems with its DTPA claims, the State attempts to tether its claims to the transaction between Pfizer and the federal government, arguing *that* sale "fits squarely" within the DTPA's definition of "trade" and "commerce." Br.34. But that creates a fundamental mismatch between the DTPA and the State's theory of liability. The State alleges that Pfizer's representations about the vaccine *to the public* led state *citizens* to take the vaccine—not that those representations led the federal government to purchase the vaccine. ROA.84 ¶¶140-41, ROA.85 ¶144. But the federal government bought Pfizer's vaccine precisely because Pfizer's clinical trial showed the vaccine was more than 90% effective, which satisfied the FDA's

50% relative risk reduction requirement for obtaining an emergency use authorization. *See supra* Part II.

Ultimately, not only are the State's claims blocked by federal immunity and preemption, but they fail to state claims under Texas law.

## CONCLUSION

The Court should affirm the district court's judgment.

Respectfully submitted.

*/s/ Scott A. Keller*

Carlton E. Wessel
DLA PIPER LLP (US)
500 Eighth St. NW
Washington, D.C. 20004

Andrew J. Hoffman II
DLA PIPER LLP (US)
Suite 400, 2000 Ave. of the Stars
Los Angeles, CA 90067

Meagan D. Self
DLA PIPER LLP (US)
Suite 2200, 1900 N. Pearl St.
Dallas, TX 75201

Lianna Bash
DLA PIPER LLP (US)
Suite 6900, 701 Fifth Ave.
Seattle, WA 98104

Scott A. Keller
LEHOTSKY KELLER COHN LLP
408 W. 11th St., 5th Floor
Austin, TX 78701
(512) 693-8350
scott@lkcfirm.com

Mark M. Rothrock
LEHOTSKY KELLER COHN LLP
8513 Caldbeck Dr.
Raleigh, NC 27615

*Counsel for Defendant-Appellee*

## CERTIFICATE OF SERVICE

I certify that on June 16, 2025, this brief was served via CM/ECF on all registered counsel and transmitted to the Clerk of Court. No paper copies were filed in accordance with the COVID-19 changes ordered in General Docket No. 2020-3.

*/s/ Scott A. Keller*
Scott A. Keller

## CERTIFICATE OF COMPLIANCE

This brief complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,911 words, excluding the parts of the brief exempted by Rule 32(f); and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Palatino Linotype) using Microsoft Word (the same program used to calculate the word count).

I further certify that: (1) any required privacy redcations have been made in compliance with Fifth Circuit Rule 25.2.13; and (2) the document has been scanned with the most recent version of a commercial virus scanning program and is free of viruses.

*/s/ Scott A. Keller*
Scott A. Keller