**No. 25-10182**

# In the United States Court of Appeals for the Fifth Circuit

STATE OF TEXAS,

*Plaintiff-Appellant,*

*v.*

PFIZER, INC.,

*Defendant-Appellee.*

On Appeal from the United States District Court
for the Northern District of Texas, Lubbock Division

**APPELLANT'S REPLY BRIEF**

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney General

AUSTIN KINGHORN
Deputy Attorney General for Civil Litigation

JOHNATHAN STONE
Chief, Consumer Protection Division

ABIGAIL E. SMITH
Assistant Attorney General
Texas Bar No. 24141756
Abby.Smith@oag.texas.gov

Office of the Texas Attorney General
Consumer Protection Division
12221 Merit Drive, Suite 650
Dallas, Texas 75251
Phone: 214-290-8830
Fax: (214) 969-7615

*Counsel for Plaintiff-Appellant*

# Table of Contents

Table of Contents ...............................................................................................ii

Table of Authorities .........................................................................................iii

Argument ............................................................................................................ 1

    I.   The PREP Act Does Not Apply to the State's DTPA Claims....................3

        A.  The State's claims fall outside the scope of PREP Act immunity under section 247d-6d(a)(1). ............................................... 3

        B.  The State's claims are not preempted under section 247d-6d(b)(8) because they are not "different from, or in conflict with" the PREP Act's requirements.................................................. 10

    II.  The FDCA Does Not Preempt the State's Claims.....................................13

    III. The State Adequately Pled its Claims Under the DTPA.......................... 14

        A.  When the State brings a DTPA suit, it need not prove a "consumer transaction." ..................................................................15

        B.  Pfizer's misrepresentations were made "in the conduct of any trade or commerce." ..................................................................19

Conclusion ....................................................................................................... 24

Certificate of Service........................................................................................ 25

Certificate of Compliance ............................................................................... 25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel. Barez*,
  458 U.S. 592 (1982) .................................................................... 6, 7

*Amstadt v. U.S. Brass Corp.*,
  919 S.W.2d 644 (Tex. 1996) ............................................................ 18

*Brittan Commc'ns Int'l Corp. v. Sw. Bell Tel. Co.*,
  313 F.3d 899 (5th Cir. 2002) .......................................................... 18

*D.C. v. Heller*,
  554 U.S. 570 (2008) ...................................................................17

*Dubin v. United States*,
  599 U.S. 110 (2023)..................................................................... 8

*Flenniken v. Longview Bank & Tr. Co.*,
  661 S.W.2d 705 (Tex. 1983) ........................................................18, 23

*Hampton v. California*,
  83 F.4th 754 (9th Cir. 2023), *cert. denied sub nom. Diaz v. Polanco*,
  144 S. Ct. 2520 (2024) ................................................................1, 8

*Happel v. Guilford Cnty. Bd. of Educ.*,
  913 S.E.2d 174 (N.C. 2025)....................................................1, 4, 5, 9, 11

*Household Retail Services, Inc. v. State*,
  No. 04-00-00734-CV, 2001 WL 984779 (Tex. App. Aug. 29, 2001,
  no pet.)................................................................................17

*Houston Livestock Show & Rodeo, Inc. v. Hamrick*,
  125 S.W.3d 555 (Tex. App. 2003) ..................................................... 23

*Kansas v. Pfizer, Inc.*,
  No. 24-1128-DDC-BGS, 2025 WL 1394240 (D. Kan. May 14,
  2025).............................................................................1, 2, 9, 11

*Martin v. Petersen Health Operations, LLC*,
37 F.4th 1210 (7th Cir. 2022) (Easterbrook, J.) ................................. 12

*Montalvo v. Bank of Am. Corp.*,
864 F. Supp. 2d 567 (W.D. Tex. 2012) ............................................ 18

*Nazari v. State*,
497 S.W.3d 169 (Tex. App.—Austin 2016), *aff'd*, 561 S.W.3d 495
(Tex. 2018) .................................................................................... 6

*Nazari v. State*,
561 S.W.3d (Tex. 2018) .................................................................. 6

*Paxton v. Dettelbach*,
105 F.4th 708 (5th Cir. 2024)........................................................... 7

*Pennsylvania v. West Virginia*,
262 U.S. 553 (1923), *aff'd* 263 U.S. 350 (1923) ................................ 7

*Rayford v. Maselli*,
73 S.W.3d 410 (Tex. App. 2002) .................................................18, 22

*Riverside Nat. Bank v. Lewis*,
603 S.W.2d 169 (Tex. 1980)........................................................... 18

*Todd v. Perry Homes*,
156 S.W.3d 919 (Tex. App. 2005) .................................................. 18

*United States v. Palomares*,
52 F.4th 640 (5th Cir. 2022) ........................................................... 4

*Word of Faith Outreach Center Church, Inc. v. Morales*,
986 F.2d 962 (5th Cir. 1993) ......................................................... 18

*Word of Faith Outreach Ctr. Church, Inc. v. Morales*,
787 F. Supp. 689 (W.D. Tex. 1992) ............................................18, 22

iv

**Statutes**

15 U.S.C. § 45 ("FTC Act") ........................................................ 2, 12, 13

21 U.S.C. §§ 301-392 (Food, Drug, and Cosmetic Act) ("FDCA") ............ 2, 13, 14

42 U.S.C. §§ 247d-6d, 247d-6e ("PREP Act") ....... 1, 2, 3, 4, 5, 6, 8, 9, 10, 11, 12, 13

Consolidated Appropriations Act, Pub. L. No. 116-260, § 1401, 134
    Stat. 1182, 3275 (2020) (Covid-19 Consumer Protection Act) ................. 2, 12, 13

Tex. Bus. & Com. Code § 17.44 ...................................................................17

Tex. Bus. & Com. Code § 17.45 ............................................................ 19, 21

Tex. Bus. & Com. Code § 17.46 .......................................................15, 16, 19, 22

Tex. Bus. & Com. Code § 17.47 ............................................... 15, 17, 18, 20, 22, 23

Tex. Bus. & Com. Code § 17.50 ...................................................... 15, 17, 18, 22, 23

# ARGUMENT

Pfizer's brief stakes out a remarkable position: It claims an absolute right for Pfizer to intentionally lie about its vaccine, without any accountability under state law. If accepted, Pfizer could falsely advertise its vaccine as 100% effective against COVID-19, and Texas would be left powerless to protect its citizens' rights to make informed decisions about their medical care. Fortunately, that is not the law.

Multiple courts have recognized that although the PREP Act provides immunity to some state law claims, it does not displace state law entirely. The PREP Act applies only to "claims for loss," which it defines to include traditional tort harms, not state constitutional violations or civil penalties. *See, e.g., Happel v. Guilford Cnty. Bd. of Educ.*, 913 S.E.2d 174, 192 (N.C. 2025) (holding "when the [PREP Act] defines loss as 'any type of loss,' it means any type of tortious injury: physical injury, property damage, loss of use, and so on"). Moreover, the PREP Act is triggered only when claims are "caused by, aris[e] out of, relat[e] to, or result[] from the administration to or the use by an individual of" a vaccine. 42 U.S.C. § 247d-6d(a)(1). Immunity does not apply unless the injury is caused by vaccine administration—not peripheral actions like deceptive marketing. *See, e.g., Hampton v. California*, 83 F.4th 754, 764 (9th Cir. 2023), *cert. denied sub nom. Diaz v. Polanco*, 144 S. Ct. 2520 (2024). Deceptive marketing claims "fail to show the require relatedness" to receive immunity under the PREP Act. *Kansas v. Pfizer, Inc.*, No. 24-1128-DDC-BGS, 2025 WL 1394240, at *5 (D. Kan. May 14, 2025) (citation omitted).

For similar reasons, the PREP Act does not preempt the State's DTPA claims because they are not "different from, or in conflict with, any requirement applicable

1

under" the PREP Act. 42 U.S.C. § 247d–6d(b)(8). The State's claims pursue a distinct interest—consumer protection through truthful commercial speech—not the interest the PREP Act safeguards. *See Kansas*, 2025 WL 1394240, at *10 ("Plaintiff's claims—which allege deceptive and misleading marketing—are too far removed from the interest that would be vindicated under the PREP Act's cause of action.") (citation omitted). Moreover, the Covid-19 Consumer Protection Act explicitly applies section 5(a) of the FTC Act to "the COVID-19 public health emergency declared pursuant to [the PREP Act]." Because the DTPA imposes materially identical requirements to the FTC Act, the DTPA is neither "different from" nor "in conflict with" federal requirements.

Finally, neither the Federal Food, Drug, and Cosmetic Act (FDCA) nor the DTPA's pleading standards are properly at issue. Pfizer's FDCA preemption argument targets just one of the State's five claims, and it depends on the false premise that the State is challenging FDA's Emergency Use Authorization. As for the DTPA, Pfizer's attacks ignore statutory text, rely on generic dictionary definitions, and cite precedent interpreting unrelated DTPA provisions.

Pfizer's position is not just legally untenable, it is morally indefensible. The company seeks to cloak deceptive conduct behind federal immunity designed to protect public health, not shield corporate dishonesty. The State has every right to demand accountability from companies that distort facts for profit, and the PREP Act does not say otherwise. This Court should reverse and remand for further proceedings.

**I.    The PREP Act Does Not Apply to the State's DTPA Claims.**

**A.    The State's claims fall outside the scope of PREP Act immunity under section 247d-6d(a)(1).**

**1.    The State's claims are not claims for "loss" under the PREP Act.**

As explained in the State's opening brief, none of the State's five DTPA claims seeks redress for "loss" as defined under the PREP Act—rather, they seek civil penalties to sanction Pfizer for its deceptive advertising and schemes to conceal the truth. ROA.87–89 ¶¶ 154–67, 168–70. These claims do not arise out of "safety concerns," as Pfizer claims. To the contrary, the State alleges that Pfizer's misrepresentations "prevented and hindered the public from obtaining information material to properly balancing the benefits and risks of its vaccine," thus "distort[ing] the risk/benefit analysis in Pfizer's favor by artificially inflating the vaccine's perceived efficacy." *Id.* ¶ 141. Regardless of how safe, beneficial, desirable, or efficacious Pfizer's vaccine might have been, Pfizer had no right to make misrepresentations to the public. The PREP Act does not apply to these claims.

**1.**    Misrepresentations to the public about the benefits and risks of a vaccine do not constitute a "loss" under the text of the PREP Act. As explained in the State's opening brief (at 28–29), the PREP Act lists four different types of "loss," all of which correlate directly to the traditional definition of personal injury or tort injury. *See* 42 U.S.C. § (a)(2)(A) (defining "loss" as including "death," "physical, mental, or emotional injury," "fear of" such injury, or "loss of or damage to property"). None apply here.

Pfizer's suggested definition of "loss" goes far beyond the PREP Act's definition to encompass virtually any type of claim a litigant could bring. It bases this interpretation on two sources: Black's Law Dictionary and the use of the phrase "any type of loss" in the PREP Act. Pfizer's Br. at 25. Pfizer contends that by the use of "any," the four listed types of loss in the statute go from defining examples to "illustrative" ones with no limiting effect.

But this proposed interpretation violates the text of the statute, canons of statutory interpretation, and court rulings. For example, in holding that the PREP Act did not immunize against state constitutional claims, the Supreme Court of North Carolina noted that the phrase "any type of loss" in the PREP Act is "circular and thus unhelpful," and that instead the examples of loss listed should define the type of loss at issue. *Happel v. Guilford Cnty. Bd. of Educ.*, 913 S.E.2d 174, 192 (N.C. 2025). Relying on the canons of *noscitur a sociis*, which "provides that a word is better understood by considering the meanings of neighboring words," and *ejusdem generis*, which "provides that a general or collective term at the end of a list of specific items is typically controlled and defined by reference to the specific classes that precede it," the Court recognized that the PREP Act's examples of loss are each "of the measure and compensable type ordinarily associated with tort law." *Id.* at 193. Thus, the PREP Act did not bar state constitutional claims. *Id.*

In addition to violating the statutory canons of *noscitur a sociis* and *ejusdem generis*, adopting Pfizer's proposed construction would also violate the canon against surplusage by rendering the word "loss" meaningless. *See United States v. Palomares*, 52 F.4th 640. 644 (5th Cir. 2022) (discussing the canon). If Congress had intended

to bar *any* claim for *any* type of relief, it would have omitted the word "loss" from the PREP Act altogether and direct that "a covered person shall be immune from suit and liability … with respect to all claims." 42 U.S.C. § (a)(2)(A).By limiting immunity to "claims for loss," Congress necessarily contemplated that some claims would not be "for loss." *Accord Happel*, 913 S.E.2d at 192 ("That choice implies the existence of some subset of claims outside the immunity's reach because they are not 'for loss.'"). The listed examples confirm that"loss" refers to its commonplace legal use as a reference to compensatory damages. In so doing, Congress excluded claims *not* for compensatory damages, including civil penalties.

2.    Pfizer also mistakenly accuses the State of seeking "restitution" and "damages," Pfizer's Br. at 28, which Pfizer construes as claims for "loss." As set forth in the State's Prayer at paragraphs 172–74 of the complaint, ROA.53, the State seeks three forms of relief: Injunctive relief preventing Pfizer from "making [mis]representations" about the COVID-19 vaccine and coordinating with social media to do the same; "civil penalties" for DTPA violations, including judgment interest and costs; and a decree that the judgment is "not dischargeable in bankruptcy." The complaint also requests any "further relief, at law or in equity." *Id.* ¶ 174.B.

None of this includes damages or restitution. The only mention of "damages" or "restitution" in the Prayer comes under the boilerplate definition of "pre-judgment and post-judgment interest," which applies to "all awards of restitution, damages, or civil penalties, as provided by law." *Id.* ¶ 173.B. The complaint's only other mention of "restitution" comes in paragraph 4, which defines the State's discovery plan under the Texas Rules of Civil Procedure. ROA.42 ¶ 4. Similarly to paragraph

5

173.B, this paragraph merely lists "restitution" in a boilerplate list of relief justifying Level 3 discovery in state court, where this case was originally filed.

Texas law distinguishes between damages, which seek "money claimed by, or ordered to be paid to, a person as compensation for loss or injury," *Nazari v. State*, 497 S.W.3d 169, 180 (Tex. App.—Austin 2016) (citation omitted), *aff'd*, 561 S.W.3d 495 (Tex. 2018), and civil penalties, which are imposed by the State "to sanction primary conduct." *Nazari v. State*, 561 S.W.3d at 507 (Tex. 2018). When the State seeks to impose *civil penalties*, it seeks to enforce its statutes "through the State's police power, which 'is a grant of authority from the people to their governmental agents for the protection of the health, the safety, the comfort, and the welfare of the public.'" *Nazari*, 497 S.W.3d at 181. As such, "civil penalties … do not qualify as damages or monetary relief," *id.*, and do not qualify as "claims for loss" under the PREP Act.

**3.** Pfizer's arguments about *parens patriae* are similarly misguided because the State's claims seek to protect the public health and welfare, which falls squarely within the heart of traditional *parens patriae* cases. Under the doctrine of *parens patriae*, a State may sue "to represent the interests of particular citizens who, for whatever reason, cannot represent themselves." *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel. Barez*, 458 U.S. 592, 601 (1982). To maintain a *parens patriae* suit, the State "must express a quasi-sovereign interest" that is "apart from the interests of particular private parties, *i.e.*, the State must be more than a nominal party." *Id.* at 607. In *Snapp*, the Supreme Court recognized that States have "a quasi-sovereign interest in the health and well-being—both physical and economic—of its residents in

general." *Id.* As such, most *parens patriae* lawsuits involve suits based on "interests that the State has in the well-being of its populace." *Id.* at 602.

Pfizer's brief relies on two recent cases from this Court, but both are readily distinguishable. The first, *Paxton v. Dettelbach*, 105 F.4th 708, 715–16 (5th Cir. 2024), held that the State could not assert a quasi-sovereign interest in regulating handgun silencers because it could not show "that the challenged statutes implicate the State's *own* interests in addition to and 'apart from the interests of particular private parties.'" *Id.* at 715 (quoting *Snapp*, 458 U.S. at 607). *Dettelbach* relied on an earlier case, *Harrison v. Jefferson Parish School Board*, where this Court held that Louisiana had no quasi-sovereign interest in enforcing its laws on behalf of school students because the State failed to "articulate an interest apart from the interests of particular private parties." 78 F.4th 765, 772 (5th Cir. 2023) (quoting *Snapp*, 458 U.S. at 607).

Unlike *Dettelbach* and *Harrison*, this lawsuit involves an issue squarely within a recognized quasi-sovereign interests: the "interests that the State has in the well-being of its populace." *Snapp*, 458 U.S. at 602. In *Kentucky v. Biden*, the Sixth Circuit recognized that "classic cases" of *parens patriae* involve "the state's prerogative to superintend the public health." 23 F.4th 585, 596 (6th Cir. 2022). Similarly, the Supreme Court has recognized *parens patriae* standing where the challenged action "seriously jeopardized" a substantial portion of the state's population's "health, comfort, and welfare." *Pennsylvania v. West Virginia*, 262 U.S. 553, 592 (1923), *aff'd* 263 U.S. 350 (1923). Because the State seeks to protect the right of its citizens to make informed decisions about their own health, thus superintending the public health of Texas, this interest satisfies *parens patriae*.

### 2. The State's claims are not "related to" the "administration" of the Pfizer vaccine.

Pfizer's next statutory argument fails for similar reasons. Pfizer argues the State's claims "relat[e] to … the administration to or the use by an individual of" the Pfizer vaccine, and are thus subject to PREP Act liability, based on an aggressive overreading that multiple courts have already rejected.

Pfizer interprets the phrase "relating to" to encompass any type of claim that even remotely "refers" to a Pfizer vaccine. Pfizer's Br. at 30. But the Supreme Court has already rejected this type of overbreadth: "If 'relate to' were taken to extend to the furthest stretch of its indeterminacy, then for all practical purposes there would be no limits, as really, universally, relations stop nowhere." *Dubin v. United States*, 599 U.S. 110, 119 (2023) (cleaned up). When examining the meaning of "relating to" in a particular statute, "the kind of relationship required, its nature and strength, will be informed by context." *Id.*

For that reason, the Ninth Circuit has held that "[c]onsidered in its context in the PREP Act, 'relating to' takes on a more targeted meaning." *Hampton v. California*, 83 F.4th 754, 764 (9th Cir. 2023), *cert. denied sub nom. Diaz v. Polanco*, 144 S. Ct. 2520 (2024). Because the "surrounding verbal phrases—'caused by,' 'arising out of,' and 'resulting from,' … all connote a type of causal relationship," the court determined the administration of a countermeasure must have actually *caused* the injury being suffered for the PREP Act to apply. "It is not enough that some countermeasure's use could be described as relating to the events underpinning the claim in some broad sense." *Id.*

8

In a state lawsuit against Pfizer for misleading marketing claims that is nearly identical to this one, the District of Kansas correctly recognized that the PREP Act's phrase "relating to" did not operate so broadly as to encompass claims that "revolve around the manner in which defendant market and promoted its vaccine to the public," because such activities "fail to show the require relatedness." *Kansas v. Pfizer, Inc.*, No. 24-1128-DDC-BGS, 2025 WL 1394240, at *5 (D. Kan. May 14, 2025) (citation omitted); *accord Happel*, 913 S.E.2d at 190 (holding that "a causal relationship between the administration or use of the covered countermeasure and the claim for loss" is required to assert PREP Act immunity).

This analysis is correct. This suit is not about particular harm to individual Texans that was *caused* by the administration of the Pfizer vaccine. Rather, it is about the public harm *caused* by Pfizer's lies, which undermined Texans' right to make informed vaccination decisions. Thus, the necessary causal relationship is lacking, and the PREP Act does not apply.

### 3. Pfizer's absurdities argument relies on a mistaken interpretation of the DTPA.

In arguing absurdity, Pfizer again misunderstands how the DTPA works. Pfizer argues that allowing Pfizer to be sued for deceptive marketing would allow the State to repackage otherwise-immunized consumer DTPA complaints, which require a claim for "loss" related to "administration." Pfizer's Br. at 32. But the State has far broader standing to bring DTPA suits than an average consumer, consistent with its *parens patriae* authority. While consumers suing under the DTPA must prove causation and damages, the State must prove neither.

The State is authorized to bring suit under the DTPA whenever it believes a company "is engaging in, has engaged in, or is about to engage in any act or practice" unlawful under the DTPA, and that the State's lawsuit "would be in the public interest." DTPA § 17.47(a); *see also infra* at III.A. A State DTPA lawsuit is not a "repackaged" consumer lawsuit—it stands apart seeking to vindicate the public interest, regardless of consumer complaints or loss. So while a consumer DTPA complaint very well may be a "claim for loss" under the PREP Act, a State lawsuit for civil penalties based on deceptive marketing falls outside the PREP Act's scope.

**B. The State's claims are not preempted under section 247d-6d(b)(8) because they are not "different from, or in conflict with" the PREP Act's requirements.**

**1.** As an initial matter, the DTPA is not "different from, or in conflict with" the PREP Act, because as discussed *supra* section I.A, the PREP Act does not apply to this case. In arguing otherwise, Pfizer puts the cart before the horse. It argues that any case involving a covered countermeasure that is *not* subject to immunity under section (a)(1) can only be litigated via "an exclusive Federal cause of action against a covered person for death or serious physical injury proximately caused by willful misconduct," subject to various requirements on venue, choice of law, and other limitations. Pfizer's Br. at 35. As Pfizer would read it, there are only two categories of claims involving its Covid-19 vaccine: Cases in which Pzfizer is immune from suit, and cases in which Pzifer is not immune, which must be raised under this restricted federal cause of action.

10

But the text of the PREP Act makes clear that there are actually *three* categories: Claims for loss based on the administration of a countermeasure, which are preempted; claims for loss based on the administration of a countermeasure that would typically be preempted, but are exempt from immunity because they involve "death or serious physical injury proximately caused by willful misconduct," 42 U.S.C. § 247d-6d(d)(1); and any *other* types of claims, which are not subject to the PREP Act at all. This second group is subject to an "exception to the immunity from suit and liability," but only insofar as they comply with the various requirements Pfizer lists under an exclusive federal right of action. *Id.*; 42 U.S.C. § 247d-6d(e) ("Procedures for suit" involving willful misconduct). Those requirements thus *only* apply to this second category of willful misconduct claims.

Pfizer's argument thus fails because the State's suit against Pfizer falls into the third category—claims not subject to the PREP Act—not the second. Where a claim falls outside the scope of the PREP Act, the venue, discovery, and other procedures set forth in 42 U.S.C. § 247d-6d(e) do not apply. For example, in *Happel*, the Supreme Court of North Carolina held that the PREP Act did not apply to state constitutional claims and thus that the lawsuit could continue in North Carolina state court pursuant to normal court procedures. 913 S.E.2d at 198. Similarly, in *Kansas v. Pfizer*, the district court ruled that a state suit against Pfizer for misleading marketing claims was was not subject to the PREP Act's exclusive federal cause of action requirement and could be remanded back to Kansas state court. No. 24-1128-DDC-BGS, 2025 WL 1394240, at *10.

Since PREP Act immunity does not apply, any "requirements" imposed by various PREP Act provisions thus do not conflict with the State's DTPA lawsuit.

**2.** Regardless, Pfizer's narrow reading of the PREP Act's "requirements" is incorrect because it looks at individual words instead of reading the statutory phrase together in context.

Pfizer's brief discusses the individual meanings of "requirement" and "this section" to try to argue no other federal requirement is relevant to this section. Pfizer's Br. at 35. But reading it in its entirety, the clause mandates that state law is only preempted if it is "different from, or is in conflict with, any requirement *applicable* under this section." *Id.* (emphasis added). That word "applicable" brings in any related laws that the PREP Act incorporates by reference, or that apply to PREP Act declarations. Pfizer even acknowledges this when it later argues that nonbinding White House guidance should apply because the "'requirements applicable under this section' are not limited to the requirements expressly stated in the statutory text." Pfizer's Br. at 36.[1]

For the COVID-19 PREP Act declaration, which applies to the Pfizer COVID-19 vaccine, the scope of "applicable" federal law expressly includes section 5(a) of the FTC Act. As Pfizer itself points out, Pfizer's Br. at 31, the Covid-19 Consumer Protection Act expressly applies to "the COVID-19 public health emergency

---

[1] Multiple courts have rejected this White House guidance, holding that it is entitled to no deference and is not independently persuasive. *See, e.g.*, *Martin v. Petersen Health Operations, LLC*, 37 F.4th 1210, 1214 (7th Cir. 2022) (Easterbrook, J.) (rejecting the advisory's "reasoning as thin" and "not control[ling] the federal judiciary").

declared pursuant to … 42 U.S.C. 247d [the PREP Act]." Consolidated Appropriations Act, Pub. L. No. 116-260, § 1401, 134 Stat. 1182, 3275 (2020). As the State explained in its opening brief, the Covid-19 Consumer Protection Act incorporates violations of section 5(a) of the FTC Act, regardless of whether the suit is brought by the federal government or otherwise, and the DTPA expressly mirrors the requirements of that law. *See* Br. at 20–23.

3.    Even if the State's misrepresentation claims based on deceptive marketing were preempted under section 247d-6d(b)(8), Pfizer fails to address the State's fifth claim based on illegal censorship schemes, which falls outside the scope of this provision. The preemption clause makes no mention of claims related to social media collusion and campaigns to censor third parties discussing the Pfizer vaccine. As such, at least this claim falls outside the scope of the PREP Act's preemption clause.

## II.  The FDCA Does Not Preempt the State's Claims.

Pfizer's entire argument on FDCA preemption rests on the flawed premise that the State is challenging FDA's decision to grant an Emergency Use Authorization (EUA) to Pfizer. *See, e.g.*, Pfizer's Br. at 42 (arguing the State is using "state law to second guess the FDA's emergency use authorization"); *see also id.* at 43–45 (similar).

The State has never argued that FDA should not have granted an EUA for the Pfizer vaccine. All its allegations focus on Pfizer's marketing and censorship decisions made *after* the EUA was granted. *See, e.g.*, ROA.57 ¶ 50 ("[A]fter receiving the EUA on December 11, 2020, Pfizer embarked on a multifaceted and systemic campaign to mislead the public into believing that its COVID-19 vaccine was

13

substantially more effective than in reality."). The complaint relies on FDA's findings in the EUA as evidence of Pfizer's misrepresentations. *See, e.g.*, ROA.56 ¶¶ 49 ("FDA went out of its way to expressly state that Pfizer's results did not support several important vaccine characteristics that are highly relevant to Pfizer's representations to the public."). All Pfizer's conflict preemption arguments rely on this incorrect characterization. *See, e.g.*, Pfizer's Br. at 42 ("Conflict preemption bars the State's claims here, because they are just a backdoor attack on the FDA's decision to grant an emergency use authorization for the Pfizer vaccine."), 44 (arguing the State "asks a court o hold 'insufficient' an action 'deemed appropriate by the' FDA," and that such claims are "conflict-preempted by the FDCA.").

Moreover, Pfizer's argument concerns only one of the State's five claims: Pfizer's use of the 95% relative risk reduction figure. That argument has no impact on the State's other four DTPA claims, which involve other misrepresentations and censorship schemes implemented by Pfizer.

## III. The State Adequately Pled its Claims Under the DTPA.

Rather than address the DTPA's text, Pfizer reverts to case law interpreting different provisions of the DTPA not at issue to contend that the State cannot bring a claim where there is no privity with a consumer and where the product was provided for free. But the text of the DTPA provisions at issue allows the the State to bring a DTPA action regardless of whether there is a "consumer" involved and regardless of whether the product was sold for money. Texas courts have repeatedly affirmed this plain meaning of the statute. As such, the State did not fail to plead its DTPA claims.

### A. When the State brings a DTPA suit, it need not prove a "consumer transaction."

Pfizer's argument that the State need allege a "consumer transaction" that involved an end-user paying for the Pfizer vaccine is incorrect and ignores both the statutory language of the DTPA and the case law. Pfizer erroneously conflates two separate DTPA provisions that are subject to different requirements.

1. The DTPA authorizes several different causes of action. The most common, a private consumer right of action brought under section 17.50, is subject to many requirements, including that the plaintiff must be a "consumer," that there must be a "false, misleading, or deceptive act or practice" as defined in section 17.46, and that the consumer must show that practice was a "producing cause of economic damages or damages for mental anguish." Tex. Bus. & Com. Code § 17.50(a). The vast majority of DTPA cases, including nearly all the cases cited by Pfizer, interpret this provision. Pfizer's Br. at 46–49.

By contrast, a DTPA action under section 17.47 may be brought by the "consumer protection division" of the Texas Attorney General's office so long as the Attorney General "has reason to believe that any person is engaging in, has engaged in, or is about to engage in any act or practice declared to be unlawful by [the DTPA], and that proceedings would be in the public interest." *Id.* § 17.47(a). For section 17.47 lawsuits, there is no requirement to show a "consumer" or to show "damages." All the State must show is a suspected DTPA violation and that the lawsuit would be in the public interest.

Pfizer has never disputed that the State's lawsuit is brought in the public interest. As such, the State need only show that it reasonably believed Pfizer violated the DTPA. To satisfy this requirement, the State alleged that Pfizer committed four "false, misleading, or deceptive acts or practices" as defined in section 17.46(b). *See* ROA.87–89 ¶¶ 156, 160, 164, 167, 170 (alleging Pfizer violated sections 17.46(b)(5), (7), (8), and (24) of the DTPA). Those provisions apply to the following acts:

> (5) representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which the person does not;

> (7) representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;

> (8) disparaging the goods, services, or business of another by false or misleading representation of facts; and

> (24) failing to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed.

Tex. Bus. & Com. Code §§ 17.46(b)(5), (7), (8), (24).

Of those four provisions, only one—subsection 24—even mentions the word consumer. At best, Pfizer's argument would perhaps foreclose an Attorney General lawsuit against Pfizer based on section 17.46(b)(24). But because each claim is based on at least one *other* DTPA violation that does not require a "consumer," the State has adequately pleaded each of its claims.

Texas courts have already rejected Pfizer's "consumer" argument in cases brought by the State under section 17.47. For example, in *Household Retail Services, Inc. v. State*, No. 04-00-00734-CV, 2001 WL 984779 (Tex. App. Aug. 29, 2001, no pet.), cited by Pfizer in its brief at 49, the State sued two companies under section 17.47 of the DTPA and obtained a temporary injunction. *Id.* at *1. When the companies claimed that none of those harmed by their actions qualified as a "consumer," the appeals court rejected their contention as irrelevant. The court held that while "[a]n aggrieved individual must meet the statutory definition of 'consumer' to bring a private cause of action against a business defendant," that "issue is not applicable where the cause of action is brought by the AG." *Id.* at *3 n.4 (comparing Tex. Bus. & Com. Code §§ 17.50, 17.47(a)).

**2.**   Despite the statutory differences between an Attorney General action and a consumer action, Pfizer fails to engage with the text of section 17.47. Instead, Pfizer cites cases interpreting *section 17.50 consumer lawsuits*, then argues that those requirements apply to section 17.47 lawsuits as well because the DTPA's preamble states the DTPA's "underlying purpose[]" is "to protect consumers." Tex. Bus. & Com. Code § 17.44(a); Pfizer's Br. at 48. But section 17.44 does not override the plain text of other parts of the statute—unless a statute's language is ambiguous, "a prefatory clause does not limit or expand the scope of the operative clause." *D.C. v. Heller*, 554 U.S. 570, 578 (2008). Rather, section 17.44 is meant to *expand*, not narrow, the DTPA's scope, and states that the DTPA "shall be liberally construed." Tex. Bus. & Com. Code § 17.44(a). It would thus be contrary to the text of both sections 17.44 *and* 17.47 to read it in a way that limits Attorney General actions.

17

The Texas Supreme Court's ruling in *Amstadt* does not hold otherwise. Although the opinion's language is imprecise, that case involved a lawsuit brought by private consumers under section 17.50, and its holding addressed only that form of DTPA lawsuit. *See, e.g.*, *Amstadt v. U.S. Brass Corp.*, 919 S.W.2d 644, 649 (Tex. 1996) ("The DTPA grants consumers a cause of action for false, misleading, or deceptive acts or practices. Tex. Bus. & Com. Code § 17.50(a)(1)."). The Supreme Court of Texas has never addressed a State DTPA action under section 17.47.

The other cases cited by Pfizer that discuss the "consumer" requirement almost all involve section 17.50 lawsuits.[2] The sole exception is *Word of Faith Outreach Ctr. Church, Inc. v. Morales*, 787 F. Supp. 689, 697 (W.D. Tex. 1992). But this Court expressly vacated that ruling insofar as it addressed "whether the investigative powers provided the Attorney General by the DTPA … may be invoked against" an organization providing free services." *Word of Faith Outreach Center Church, Inc. v. Morales*, 986 F.2d 962, 969 (5th Cir. 1993). Furthermore, that district court opinion has no binding effect on this Court and directly conflicts with other Texas state court rulings, as discussed *infra.*

---

[2] *See, e.g.*, *Todd v. Perry Homes*, 156 S.W.3d 919 (Tex. App. 2005) (private consumer lawsuit based on faulty home construction); *Brittan Commc'ns Int'l Corp. v. Sw. Bell Tel. Co.*, 313 F.3d 899 (5th Cir. 2002) (private consumer lawsuit between two companies); *Rayford v. Maselli*, 73 S.W.3d 410 (Tex. App. 2002) (private consumer lawsuit brought by former client against attorneys); *Montalvo v. Bank of Am. Corp.*, 864 F. Supp. 2d 567 (W.D. Tex. 2012) (private consumer lawsuit brought by a mortgagor against the lending bank); *Riverside Nat. Bank v. Lewis*, 603 S.W.2d 169 (Tex. 1980) (private consumer lawsuit by a potential borrower against a bank); *Flenniken v. Longview Bank & Tr. Co.*, 661 S.W.2d 705 (Tex. 1983) (private consumer lawsuit by homeowners against foreclosing bank).

### B. Pfizer's misrepresentations were made "in the conduct of any trade or commerce."

The State has also adequately pled that Pfizer's misrepresentations occurred "in the conduct of any trade or commerce." Tex. Bus. & Com. Code § 17.46(a). In arguing otherwise, Pfizer once again turns to generic dictionary definitions instead of the DTPA's text and cases. *See, e.g.*, Pfizer's Br. at 51 (arguing for the application of Black's Law Dictionary definitions of "trade" and "commerce," instead of the DTPA's statutory definitions at Tex. Bus. & Com. Code § 17.45(6)). But the statutory text, the case law, and even some dictionary definitions all demonstrate that Pfizer's misrepresentations about its vaccine *were* made in connection with "trade or commerce" under the DTPA.

**1.** One need not look further than the text of the DTPA itself to determine the definitions of "trade" and "commerce." The statute defines those terms to include "the advertising, offering for sale, sale, lease, or distribution of any good or service … wherever situated, and shall include any trade or commerce directly or indirectly affecting the people of this state." Tex. Bus. & Com. Code § 17.45(6). This definition is drafted broadly, and is not limited just to "sales"—it also includes non-monetary transactions such as advertising and distribution, and applies whenever such transactions "directly or indirectly" affect the people of Texas.

Pfizer takes this language and argues, based on Black's Law Dictionary, that such terms cannot include goods offered for free because "advertising" must require the promotion of a sale. Pfizer's Br. at 50. Pfizer then argues that even though

"distribution" contains no sale requirement (not even in Black's Law Dictionary), it must require a financial transaction because the surrounding terms do, too. *Id.* at 51.

This is incorrect. As an initial matter, interpreting every term within the definition of "trade" and "commerce" as requiring a "sale" would render the statutory language surplusage. If the Legislature had intended such a narrow reading, it could have simply defined "trade" and "commerce" to mean "sales," or limited the terms to "advertising for sale," "distributing for sale," and so on. But it did not. Instead, the Legislature expressly distinguished "sale" from advertising and distribution—treating each as an independent basis for liability under the DTPA. Furthermore, common sense dictates that goods and services can be advertised or distributed regardless of whether they are being sold or given away—for example, a new dentist office may advertise promotional free cleanings, or a smoothie shop may distribute free smoothies on National Flip Flop Day.[3]

Binding Texas authority has interpreted "advertising" and "distribution" to not require a sale, at least for section 17.47 lawsuits brought by the Attorney General. In *Mother & Unborn Baby Care of North Texas, Inc. v. State*, the Attorney General sued a pro-life crisis pregnancy center for violating the DTPA, based on the center deceptively advertising itself as an abortion clinic in the phone book and distributing various free pamphlets. 749 S.W.2d 533, 537–38 (Tex. App. 1988), *writ denied* (Nov.

---

[3] *See, e.g.*, Tropical Smoothie Cafe, *National Flip Flop Day*, available at https://www.tropicalsmoothiecafe.com/national-flip-flop-day/.

16, 1988). After trial, the State got a permanent injunction against the center that "mandated disclosure in advertising." *Id.* at 536.

On appeal, the center argued that "their conduct [did] not constitute trade or commerce because they do not actually sell abortions and medical services, and therefore the DTPA does not apply." *Id.* at 537. The appeals court rejected that argument, noting that the center "sought and obtained" advertising in the phone book and "distributed goods in the way of pamphlets," regardless of the fact that both involved free services. *Id.* at 537–38. The court held this was a sufficient basis for a DTPA action, and noted that "[t]he term 'sale' is merely one of five possible definitions listed under section 17.45(6)."

Pfizer argues that the DTPA applied to the center only because the "plaintiffs" had "*sought* 'to purchase a service.'" Pfizer's Br. at 52. But that is wrong. There were no consumer plaintiffs in the *Mother* case, and in any event, the section Pfizer cites addressed the *separate* issue of whether the center could evade DTPA liability because they did "not sell any goods or services." *Mother*, 749 S.W.2d at 538. After the court *first* held that the center's conduct constituted trade or commerce because they engaged in advertising and distribution, *id.* at 537 ("Appellants first argue that their conduct does not constitute trade or commerce … ."), the court *next* held that the DTPA did not independently require the center to complete a sale. *Id.* at 538 ("Appellants next contend that they do not sell any goods or services, and therefore the DTPA does not apply to their activities. We disagree.").

Pfizer cites two additional cases on this point, both unavailing. The first was vacated by this Court, is unpersuasive, and conflicts with Texas courts' interpretation

21

of a Texas statute . *See supra* III.A (discussing *Word of Faith*). The second did not address the meaning of "trade and commerce" at all. *See Rayford*, 73 S.W.3d at 411. In *Rayford*, a private individual attempted to bring a private consumer lawsuit under section 17.50 against his public defenders. *Id.* at 410. The court did not address whether free legal services were part of "trade or commerce" under section 17.46(a) or section 17.45(5); rather, it held that the plaintiff did not qualify as a "consumer" under section 17.50 and section 17.45(4) because those sections require that a consumer "purchase or lease" goods or services. *Id.* at 411 ("Under the DTPA, a consumer is one who seeks or acquires, by purchase or lease, any goods or services."). As discussed, the "consumer" requirement does not attach to section 17.47 lawsuits brought by the Attorney General, so this holding is irrelevant. *See supra* III.A.

The text of the DTPA and binding Texas authority are both clear: Advertising and distributing goods and services for free is still part of "trade or commerce," particularly by a commercial actor in suits brought by the State. Because Pfizer both advertised and distributed its vaccine in Texas, the State has adequately pled that Pfizer's misrepresentations occurred "in the conduct of any trade or commerce." Tex. Bus. Com. Code § 17.46(a).

**2.** The State has also pled Pfizer's misrepresentations occurred in the course of trade or commerce for an additional reason: Pfizer *did* sell its vaccines to the federal government, and those transactions can support a DTPA lawsuit brought by the State. Though Pfizer repeatedly harps on the point that Texas consumers *received* their Pfizer vaccines for free, *see* Pfizer's Br. at 50–53, Pfizer *sold* those vaccines to the federal government for billions of dollars. *See, e.g.*, ROA.57–58 ¶ 53 (Pfizer's

initial sale of 100 million doses for $1.95 billion), ROA.86 ¶ 147 (Pfizer's second sale of 500 million doses for $10.05 billion), *Id.* ¶ 148 (a final sale for $3.2 billion worth of additional vaccines in 2022).

As the State explained in its opening brief, Br. at 34–35, a defendant need not sell its product directly to a consumer to be held liable under the DTPA. As the Texas Supreme Court noted in *Flenniken v. Longview Bank*, "[p]rivity between the plaintiff and defendant is not a consideration … . The only requirement is that the goods or services sought or acquired … form the basis of his complaint." *Flenniken v. Longview Bank & Tr. Co.*, 661 S.W.2d 705, 707 (Tex. 1983). Subsequent courts have affirmed that "deceptive trade practices … can occur following the initial transaction," further clarifying that liability under the DTPA is not confined to direct dealings. *Houston Livestock Show & Rodeo, Inc. v. Hamrick*, 125 S.W.3d 555, 574 (Tex. App. 2003).

While *Flenniken* involved a section 17.50 consumer lawsuit and focused on consumer standing, its core holding remains instructive: direct privity between the defendant and the consumer is not a prerequisite to DTPA liability. That principle applies with even greater force to enforcement actions under section 17.47, where the State proceeds in a *parens patriae* capacity to vindicate its own interests. Pfizer's sales to the federal government are thus a sufficient independent form of conduct that occurred in the course of "trade" or "commerce" under the DTPA.

23

## CONCLUSION

This Court should reverse and remand for further proceedings.

DATED: July 21, 2025

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney General

AUSTIN KINGHORN
Deputy Attorney General for Civil Litigation

JOHNATHAN STONE
Chief, Consumer Protection Division

*/s/ Abigail E. Smith*
ABIGAIL E. SMITH
Assistant Attorney General
Texas Bar No. 24141756
Abby.Smith@oag.texas.gov

Office of the Texas Attorney General
Consumer Protection Division
12221 Merit Drive, Suite 650
Dallas, Texas 75251
Phone: 214-290-8830
Fax: (214) 969-7615

Counsel for Plaintiff-Appellant

24

## CERTIFICATE OF SERVICE

On July 21, 2025, this document was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and (3) the document has been scanned with the most recent version of CrowdStrike Falcon and is free of viruses.

*/s/ Abigail E. Smith*
ABIGAIL E. SMITH

## CERTIFICATE OF COMPLIANCE

This brief complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,500 words, excluding the parts of the brief exempted by Rule 32(f); and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Equity) using Microsoft Word (the same program used to calculate the word count).

*/s/ Abigail E. Smith*
ABIGAIL E. SMITH